**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JOHN MATHYS,<br><br>Plaintiff,<br><br>v.<br><br>THE HARTFORD GOLD GROUP, LLC d/b/a AMERICAN HARTFORD GOLD GROUP,<br><br>and<br><br>DAVID WOLAN,<br><br>Defendants. | Case No. 20cv03927-CPK-JTG |

**FIRST AMENDED COMPLAINT**

1.      This is an action for breach of contract, violations of the Illinois Consumer Fraud Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*, constructive fraud, fraudulent misrepresentation, violations of the Illinois Securities Law, and conversion.  Defendant The Hartford Gold Group, LLC ("HGG") enticed Plaintiff to invest nearly all of his retirement funds after bombarding him with gloom-and-doom representations about supposed "damn scary" macroeconomic conditions that could assertedly prompt the federal government to "freeze and seize" Plaintiff's assets.  HGG specifically tailored its marketing representations to senior citizens such as Plaintiff.  Once Defendants had Plaintiff, who is eighty-three years of age, on the hook, HGG lied to him about the value of the gold and silver assets he purchased in late 2019 for nearly $600,000.  In total, Defendants defrauded Plaintiff of $300,000 or more of his retirement savings.

1

**PARTIES**

2.      Plaintiff John Mathys is eighty-three years of age and resides in Chicago, Illinois. A retiree, Mr. Mathys was a professor at private university in Chicago during his professional career, until his retirement in 2016.  He is a citizen of Illinois.

3.      Defendant The Hartford Gold Group, LLC ("Hartford Gold Group" or "HGG") was incorporated in California in 2015, has its principal office in Los Angeles, California, and is a citizen of California.  Defendant HGG holds itself out as an investment advisor.  On its website, HGG advertises that it "helps individuals… protect their wealth."

4.      HGG is a manager-managed limited liability company.  HGG claims on its website that it is a "family-owned" business.  The Manager, Founder, and Chief Executive Officer of HGG is Sanford Mann.   Upon information and belief, upon founding HGG in 2015, Mann had seven years of experience as a real estate broker and four years of experience as a metals sales associate.

5.      HGG announced on March 2, 2020 that it "has been renamed as American Hartford Gold Group."[1]

6.      Defendant David Wolan ("Wolan") is a Senior Director of Defendant HGG.  He is a resident and citizen of California.

**VENUE AND JURISDICTION**

7.      The Court has subject matter jurisdiction in this action pursuant to 28 U.S.C. § 1332(a)(1) because Plaintiff is a citizen of a different State from each Defendant, and more than $75,000 is in controversy.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

---

[1] *See* https://finance.yahoo.com/news/hartford-gold-group-becomes-american-230000419.html.

## FACTUAL ALLEGATIONS

9.      Defendant HGG, based in Los Angeles, California, sells precious metals—primarily, gold and silver.  In describing to prospective customers why an individual should consider purchasing gold and/or silver from HGG, HGG characterizes such purchase(s) as comprising an investment opportunity for the purchaser.

10.      Plaintiff invested $35,000 with Defendant HGG on December 11, 2018 ("2018 Investment").  Plaintiff purchased silver and gold assets from Defendant with invested funds.

11.      The gold and silver assets purchased with Plaintiff's 2018 Investment were stored on Plaintiff's behalf with International Depository Services ("IDS") of Delaware.

12.      In a statement dated February 28, 2019, IDS advised Plaintiff that it was storing the following assets on Plaintiff's behalf as purchased from Defendant HGG with the 2018 Investment.  IDS' statement to Plaintiff read as follows:

**Fungible Gold Bullion**

| Prod Code | Prod Description | Brand | Serial Number | Quantity | GTO | Fineness | FTO |
|---|---|---|---|---|---|---|---|
| GB1PAWC | 1 Oz Gold Pamp Bar with Cert | PAMP | | 1 | 1.00 | 0.99990 | 1.00 |
| GEA1 | 1 Oz Gold American Eagle Any Year | | | 2 | 2.00 | 0.91670 | 2.00 |
| GEAT | 0.10 Oz Gold American Eagle Any Year | | | 14 | 1.40 | 0.91670 | 1.40 |
| GML1 | 1 Oz Gold Canadian Maple Leaf .9999 | | | 2 | 2.00 | 0.99990 | 2.00 |
| GMLQBISON | 0.25 Oz Gold Canadian Bison | | | 40 | 10.00 | 0.99990 | 10.00 |
| | **TOTAL GOLD** | | | 59 | 16.40 | | 16.40 |

**Fungible Silver Bullion**

| Prod Code | Prod Description | Brand | Serial Number | Quantity | GTO | Fineness | FTO |
|-----------|------------------|-------|---------------|----------|-----|----------|-----|
| SANF5B1W | 5 Oz Silver National Park Block Island Wildlife 2018 | ATB | | 5 | 25.00 | 0.99900 | 25.00 |
| SB1MORG | 1 Oz Silver Bullion Morgan Bar .999 | | | 1 | 1.00 | 0.99900 | 1.00 |
| SML1 | 1 Oz Silver Canadian Maple Leaf | | | 48 | 48.00 | 0.99900 | 48.00 |
| SML1.25BISON | 1.25 Oz Silver Canadian Bison | CANADA | | 60 | 75.00 | 0.99900 | 75.00 |
| | **TOTAL SILVER** | | | 114 | 149.00 | | 149.00 |

(Ex. A.)

13.     Plaintiff later invested additional monies with HGG in 2019.

14.     Prior to investing in 2019 with Defendant HGG, Plaintiff held his savings in three accounts— a traditional IRA account, a Roth IRA account, and a non-retirement account.

15.     HGG commenced an aggressive marketing campaign in 2019 with Plaintiff to solicit additional investments from Plaintiff.  This included emails and phone calls.

16.     An HGG representative named Ben Monaci emailed Plaintiff on January 30, 2019, stating:

> Hear (sic) are additional articles to read and understand that it's time now to minimize your loss of principal and have full control of a portion of your wealth in a hard asset just like all Central Banks.

(Ex. B.)  One of the MS Word attachments to Monaci's email intoned, "America Is Headed For An Economic Collapse That Will Be Worse Than The Great Depression, Experts Warn," and sounded the alarm of a "student loan bubble" that could "collapse" the economy. (Ex. B at 4.)

4

Metadata from that email attachment reflects that it was authored by Monaci. In a second MS Word document attached to the email and also authored by Monaci, Monaci included a 1936 Great Depression still photo by Dorothea Lange entitled, "Migrant Mother," which is widely known for its evocative depiction of human desperation. (Ex. B at 6.)

17. HGG representatives began calling Plaintiff frequently in the second half of 2019. Among those calling Plaintiff from HGG were a Vice President named Paul Stone, and Defendant Wolan. Central to HGG's pitch to Plaintiff was that investing with HGG would be a good way for Plaintiff to "protect" his wealth.

18. Defendant Wolan sent Plaintiff a cover letter on or before September 25, 2019, with an array of enclosures. The cover letter stated,

> "Hi Mr. Mathys, It was a pleasure speaking with you today. The articles attached will give you a better understanding of what Bail Ins are and how they work. Unlike the 2008 Bail Out, they will now go after Depositor Accounts in order to clear off debt when a large-scale correction or sell off occurs. This is the main reason why investors are moving into Gold and Silver Assets IRA Plans. Attached, please find your SDIRA Application, Bail In Reports and Forbes article explaining the need for Self-Directed IRA Accounts…"

(Ex. C at 1.)

19. Wolan attached enclosures to that letter that expounded on the proposition that assets deposited in banking institutions were at risk because the government could execute an asset-seizure type program known as a "bail-in," which, Defendants further asserted:

> "is the opposite of a bail-out…[and] involves…governments
>
> using taxpayers['] money. Legislation that would allow them
>
> [the government] to first **FREEZE** and then **SEIZE** bank
>
> assets during the next crisis."

(Ex. C at 2 (bolding, capitalization, and underline in the original).)

5

20.     Defendants' assertions regarding "bail-ins"— including, specifically, to the effect that "the[] [Government] will now go after [Plaintiff's] Depositor Accounts"— were false and misleading.  In reality, a "bail-in" only rises to the status of a real-world event that could be hypothetically actualized in instances of financial institutions in severe distress.  Even then it is a remote possibility.  There was no evidence whatsoever as of Fall 2019 that either of the two financial institutions at which Plaintiff then held his investments, Chase Bank and LPL Financial ("LPL"), were in any sort of severe financial distress.  To the contrary, both are, and were, publicly traded entities-- LPL in its own right, and Chase Bank as a subsidiary of JPMorgan Chase).  Chase Bank and LPL's financial performance as of Q3 2019 demonstrated healthy balance sheets and strong future outlooks, according to Wall Street analysts.

21.     Wolan wrote to Plaintiff again on September 25, 2019, in follow up to a phone conversation with Plaintiff that afternoon.  Wolan reiterated his guidance to Plaintiff that Plaintiff invest his money "safe[ly]" in "precious metals, "before this crisis truly begins as history completely indicates it will later this year." (Ex. D at 1.) The attachments to the September 25, 2019, Wolan letter consisted of a flood of illusory promises, misrepresentations, carnival-barking nonsense rhetoric, and scare tactics.  Variously, these materials:

   a.   asserted, with regard to China GDP figures:

        "Those are horrific numbers, and they are very reminiscent of what

        we witnessed back in 2008."

      (Ex. D at 25.)

   b.   described the then-contemporaneous economic environment as "damn scary."

      (Ex. D at 25.)

   c.  asserted:

"But the economic environment that is ahead will be much worse than any of the mirror recessions that the U.S. has experienced in the past, and that means things are going to be extremely tough for our retirees."

(Ex. D at 25.)

c. asserted that a "stock market" "bust" was looming.

(Ex. D at 11.)

d. asserted that

"The best precious metals to invest in if you want to protect your wealth is to buy gold or silver in physical form.  These precious metals are most commonly sold in bars, rounds and coins.  We offer a wide selection of gold and silver coins, as well as options for starting a gold IRA."

(Ex. D at 3.)

e. asserted that

"If all of history's warning signs are flashing we are in the throat of a recession now, and banks needed trillions to stay in business in 2008 after absolutely fabulous financial times, and now they would be bailed-into using account holders money instead of printed money by the Fed, why would I maintain keeping (sic) funds where they are now trusted to banks or financial advisory firms instead of gold and silver in your account inside a private vault."

(Ex. D at 30.)

Defendants supplied this last assertion (sub-paragraph (e)) in quotes in the original printed material, as if to imply that the statement derived from some third-party publication of some

standing. Upon information and belief, the quotation is simply an invention of Defendants' own fertile imagination.

22. Defendant HGG made separate statements to Plaintiff regarding coins with asserted unique appeal and value that, according to Defendant, Plaintiff should purchase. HGG, in the course of advising Plaintiff about gold and silver coins he should consider purchasing, drew a contrast in written communications to Plaintiff between "bullion" coins "vs." "numismatic" coins, as to the latter of which, Defendant asserted:

> "Some...can earn substantial premiums above and beyond the metal's bullion [*i.e.*, intrinsic] value simply due to the fact that the coin issue is extremely hard to find."

(Ex. D at 6.) In fact, with regard to coins sold by Defendant to Plaintiff, the opposite was true, and Defendant HGG was aware that the opposite was true. Unbeknownst to Plaintiff, the semi-numismatic coins that Defendant sold Plaintiff often tend to be (as in the instance of this case) so specialized as to have only an extremely narrow market and limited appeal, with lesser attendant value than straightforward commodity investments in gold or silver bars.

23. In speaking with Plaintiff by phone, Defendant Wolan encouraged Plaintiff to liquidate the stock holdings in his traditional IRA and Roth IRA accounts, and invest those assets with HGG.

24. Wolan was aware at all times during his contacts with Plaintiff that Plaintiff was a retiree of advanced age. Wolan's knowledge of Plaintiff's advanced age is imputable to Defendant HGG.

### PLAINTIFF'S FIRST 2019 INVESTMENT

25. Defendants succeeded in persuading Plaintiff to make three investments with HGG in Fall 2019. Each investment occurred in October 2019.

8

26.     For the first of those three investments in October 2019, Mr. Mathys paid HGG $219,138.68 by check from Chase Bank on October 11, 2019.  As a retiree with no source of occupational income, Plaintiff requested from HGG a disbursement of $7,400.00 in cash from the $219,138.68.  Defendant complied with Plaintiff's request, on October 21, 2019.

27.     Thus, after accounting for said October 21, 2019 disbursement, the total sum of Plaintiff's first 2019 investment with HGG (the "First 2019 Investment") was $211,739.00 ($219,138.68 less $7,400.00).

28.     HGG created an invoice for Plaintiff's First 2019 Investment as a purchase of silver and gold coins, dated October 14, 2019, in the following amounts:

| Quantity | Description | Unit Price | Total |
|---|---|---|---|
| 8 | Silver Canadian Buffalo 1.25 oz Box of 400 | $17,367.74 | $138,941.92 |
| 5 | Gold Canadian Buffalo 0.25-oz Sheet of 20 | $13,922.16 | $69,610.80 |
| 94 | Silver Canadian Polar Bear & Cub 1.5 oz. 2015 | $30.44 | $2,861.36 |
| 1 | Silver Canadian Polar Bear & Cub 1.5 oz 2015 | $24.60 | $24.60 |
| | | | $211,438.68 |

(Ex. E.)

29.     Prior to Plaintiff's First 2019 Investment, Defendant did not advise Plaintiff what type of metal asset (bars, "rounds," or coins) Plaintiff stood to obtain by virtue of his October 11, 2019 investment.  Specific to coins, Defendant did not advise Plaintiff what type of coins Defendant intended to convey to him, prior to Plaintiff's investment.

30.     All the coin values represented to Plaintiff by Defendant HGG with respect to the First 2019 Investment were false; each asset's actual value was significantly less than what

Defendant HGG represented to Plaintiff, and indeed, less than half of what Defendant HGG represented to Plaintiff.

31.     The "Gold Canadian Buffalo 0.25-oz.," "Sheet of 20" coins (Quantity 5) purchased with Plaintiff's First 2019 Investment were transferred to be stored on Plaintiff's behalf with a company called Delaware Depository, of Wilmington, Delaware, on or around October 22, 2019.

32.     The "Silver Canadian Polar Bear & Cub 1.5 oz. 2015" "Sheet of 20" coins (Quantity 94), and "Silver Canadian Polar Bear & Cub 1.5 oz 2015" coins (Quantity 1) purchased with Plaintiff's First 2019 Investment were also transferred to be stored on Plaintiff's behalf to Delaware Depository on or around October 22, 2019.

33.     Delaware Depository issued a statement to Plaintiff dated October 23, 2019 accounting for these transfers; that statement stated:

**GOLD**

| Product Code | Product Description | Prod Balance | Gross Troy Ounces |
|---|---|---|---|
| GCBNQ19 | Gold Canadian Buffalo, 2019 - 1/4 oz. | 69.000 | 17.250 |
| GCBUFQ | Gold Canadian Buffalo - 1/4 oz. | 31.000 | 7.750 |

**SILVER**

| Product Code | Product Description | Prod Balance | Gross Troy Ounces |
|---|---|---|---|
| SML1.5 PC | Silver and Canadian Polar Bear and Cub -- 1.5 oz. | 95.000 | 142.500 |

(Ex. F.)

34.     The "Silver Canadian Buffalo 1.25 oz Box of 400," coins (Quantity 8) were transferred to Delaware Depository, to be stored on Plaintiff's behalf, on or around November 6, 2019.

10

35.    Delaware Depository issued a statement to Plaintiff dated November 8, 2019 accounting for such transfer:

**SILVER**

**SML1.25BN18   Silver Canadian Buffalo -- 1.25 oz. 2018**

| Activity Date | Quantity Received/Shipped (-) | | References |
|---|---|---|---|
| | Units | Ounces | |
| 11/6/2019 | 400.000 | 500.000 | ~TR~Bayside Metal Exchange Premium~135332~~31144~ |
| | 400.000 | 500.000 | NET PRODUCT CHANGE |

**SML1.25BN19   Silver Canadian Buffalo -- 1.25 oz. 2019**

| Activity Date | Quantity Received/Shipped (-) | | References |
|---|---|---|---|
| | Units | Ounces | |
| 11/6/2019 | 2,800.000 | 3500.000 | ~TR~Bayside Metal Exchange Premium~135332~~31144~ |
| | 2800.000 | 3500.000 | NET PRODUCT CHANGE |
| | | 4000.000 | NET SILVER CHANGE |

(Ex. G.)

## PLAINTIFF'S SECOND 2019 INVESTMENT

36.    Roughly one week later, on October 17, 2019, Mr. Mathys made a second investment with Defendant HGG, drawn from his Roth IRA retirement account, in the amount of $71,406.63 (the "Second 2019 Investment"). That amount represented the entirety of Plaintiff's Roth IRA retirement account.

37.     Defendant HGG invoiced Mr. Mathys for his Second 2019 Investment as a purchase of silver and gold coins on October 29, 2019, in the following amounts:

| Quantity | Description | Unit Price | Total |
|---|---|---|---|
| 30 | Gold Canadian Buffalo 0.25 oz | $693.97 | $20,819.10 |
| 2 | Silver Canadian Buffalo 1.25-oz Box of 400 | $17,455.90 | $34,911.80 |
| 360 | Silver Rose Crown Guinea 1.25-oz | $42.87 | $15,433.20 |
| 1 | Silver Rose Crown Guinea 1.25-oz | $30.87 | $30.87 |
| | | | $71,194.97 |

(Ex. H.)

38.     All the coin values represented to Plaintiff by Defendant HGG in the October 29, 2019 invoice were false; none of those assets had values even remotely approximating those represented by Defendant HGG, as subsequently and first revealed to Plaintiff in a sequence of events that transpired in mid-March 2019.

39.     The value of the gold and silver coins purchased with Plaintiff's Second 2019 Investment were tracked in an account opened on Plaintiff's behalf in conjunction with his Second 2019 Investment at Equity Trust Company ("Equity Trust" or "Equity") of Westlake, Ohio.

40.     Equity assigned account number 200393603 to this account.

41.     In mid-March 2020, Ms. Shirley Roy, who lives with Plaintiff and has Power of Attorney for Plaintiff, in the course of gathering information for purposes of assisting Plaintiff to prepare his 2019 IRS tax filings, requested an account statement from Equity for the 200393603

account. Equity complied, and sent Ms. Roy and Plaintiff a Q4 2019 quarterly statement dated December 31, 2019, the contents of which shocked both Plaintiff and Ms. Roy.

42.     The December 31, 2019 statement for account number 200393603 reflected that the "ending market value" of Mr. Mathys' gold and silver purchased with the Second 2019 Investment, as of December 31, 2019, was $37,348.99. This, on an original "investment" of $71,406.63 less than three months prior. According to these documents, Mr. Mathys lost nearly half of his Second 2019 Investment virtually overnight at a juncture when the "spot" market for gold and silver was neither increasing nor decreasing in a fashion such as would explain or otherwise account for such an investment loss. The Equity Q4 2019 statement stated:

| | Current Period | Year-to-Date |
|---|---|---|
| | 10/1/2019 to 12/31/2019 | 01/01/2019 to 12/31/2019 |
| **Beginning Market Value** | $0.00 | $0.00 |
| Interest Earned on Cash Account | $1.17 | $1.17 |
| Transfers in | $71,205.15 | $71,205.15 |
| Investment Purchases | -$71,194.97 | -$71,194.97 |
| Net Sweep Activity | ($11.35) | ($11.35) |
| Change in Investment Value | $37,348.99 | $37,348.99 |
| **Ending Market Value on 12/31/2019** | $37,348.99 | $37,348.99 |
| Pending Investment Purchases | $0.00 | - |
| **Ending Market Value Including Pending Investment Purchases** | $37,348.99 | - |

(Ex. I.)

## PLAINTIFF'S THIRD 2019 INVESTMENT

43.     Eleven days after making the Second 2019 Investment with HGG, on October 28, 2019, Mr. Mathys made a third investment with HGG, drawn from his traditional IRA retirement

account, in the amount of $286,186.20 (the "Third 2019 Investment"). That represented the entirety of Plaintiff's traditional IRA retirement account.

44.     Defendant HGG invoiced Mr. Mathys for his Third 2019 Investment as a purchase of silver and gold coins on October 29, 2019, in the following amounts:

| Quantity | Description | Unit Price | Total |
|---|---|---|---|
| 66 | Gold Canadian Gyrfalcon .25 oz 2016 | $433.78 | $28,629.48 |
| 42 | Gold Rose Crown Guinea .25 oz | $684.68 | $28,756.56 |
| 42 | Gold Canadian Buffalo 0.25 oz | $693.95 | $29,145.90 |
| 7 | Silver Canadian Buffalo 1.25 oz Box of 400 | $17,455.06 | $122,185.42 |
| 1807 | Silver Rose Crown Guinea 1.25 oz | $42.87 | $77,466.09 |
| 1 | Silver Rose Crown Guinea 1.25 oz | $2.84 | $2.84 |

$286,186.29

(Ex. J.)

45.     The value of the gold and silver coins purchased with Plaintiff's Third 2019 Investment were tracked in an account opened on Plaintiff's behalf in conjunction with his Third 2019 Investment at Equity Trust. Equity assigned account number 200393605 to this account.

46.     All the coin values represented to Plaintiff by Defendant HGG in the October 29, 2019 invoice were false; none of those coins had values even remotely approximating the values represented by Defendant HGG.

47.     Plaintiff and Ms. Roy learned of the falsity of Defendant HGG's October 29, 2019 invoice at the same juncture, and in the same fashion that they learned of the true value of Mr. Mathys' Second 2019 Investment: upon receiving a Q4 2019 statement from Equity, sent to

14

Plaintiff and Ms. Roy in mid-March 2020 in response to Ms. Roy's request for the same from Equity in the course of beginning to prepare Plaintiff's 2019 tax filings with the Internal Revenue Service.

48.     The contents of the Q4 2019 Equity statement for account 200393605, which Equity sent to Plaintiff and Ms. Roy in mid-March 2020, shocked Mr. Mathys and Ms. Roy. Concerning the value of account 200393605 (the Third 2019 Investment), the Equity Q4 2019 statement stated:

| | Current Period 10/1/2019 to 12/31/2019 | Year-to-Date 01/01/2019 to 12/31/2019 |
|---|---|---|
| **Beginning Market Value** | $0.00 | $0.00 |
| Interest Earned on Cash Account | $0.43 | $0.43 |
| Transfers in | $286,226.29 | $286,226.29 |
| Investment Purchases | ($286,226.29) | ($286,226.29) |
| Asset Redemptions and Sales | $2,142.55 | $2,142.55 |
| Expenses and Fees | ($40.00) | ($40.00) |
| Distributions | ($2,000.00) | ($2,000.00) |
| Net Sweep Activity | ($142.98) | ($142.98) |
| Change in Investment Value | $158,190.05 | $158,190.05 |
| **Ending Market Value on 12/31/2019** | $158,190.05 | $158,190.05 |
| Pending Investment Purchases | $0.00 | - |
| **Ending Market Value Including Pending Investment Purchases** | $158,190.05 | - |

(Ex. K.)

49.     According to this document, Mr. Mathys' Third 2019 Investment was worth less than half what Defendant HGG had told him it was worth on October 29, 2019.

15

### PLAINTIFF'S LOSSES

50.    Plaintiff invested a total of $569,031.51 with HGG across the First, Second, and Third 2019 Investments.

51.    Plaintiff lost over 50% in the value of his First, Second, and Third 2019 Investments in this case the moment Defendant HGG took Plaintiff's monies and sold him gold and silver assets, primarily "semi-"numismatic coins, with far lesser value than the amount of Plaintiff's investments.

52.    Defendant HGG made material misrepresentations in each of the three invoices issued to Plaintiff in 2019 (one on October 14, 2019, and two on October 29, 2019).  Specifically, HGG falsely stated to Plaintiff in each of those invoices that Defendant had sold Plaintiff $211,438.68, $71,194.97, and $286,186.29 worth of gold and silver (mostly in the form of coins which a third party entity later described to Plaintiff as "semi-numismatic").

53.    The actual value of the assets sold by Defendant HGG to Plaintiff at the time of sale in October 2019 was less than half of what HGG represented.  Defendant HGG's misrepresentations were both knowing and intentional.

54.    The losses caused by Defendant HGG to Plaintiff were not attributable to movements in the price of gold and silver on the spot market between October 2019 and late April 2020.  During such period, the spot price of gold increased somewhat, and the price of silver decreased somewhat.

55.    The price of gold fluctuated slightly between October 10, 2019 and December 31, 2019 on the spot market, and increased during this time period on the whole, from $1,488.95/oz. on October 10, 2019, to $1,528.94/oz. on December 31, 2019 (an increase of 2.7%).  The price of gold fluctuated modestly between December 31, 2019 and April 25, 2020, and increased during

16

that latter time period on the whole, from $1,528.94/oz., to $1,710.14/oz. on the spot market (a further increase of 11.9%).

56.     The price of silver fluctuated between October 10, 2019 and December 31, 2019 on the spot market, and increased during this time period on the whole, from $17.56/oz. on October 10, 2019, to $18.03/oz. on December 31, 2019, an increase of 2.7%.  The price of silver fluctuated between December 31, 2019 and April 25, 2020, and declined during this latter time period on the whole, from $18.03/oz., to $15.15/oz. on the spot market, a decrease during such latter time period (December 31, 2019 to April 25, 2020) of 16.0%.

**EQUITY TRUST**

57.     Later in Spring 2020, Plaintiff received from Equity Trust a Q1 2020 quarterly statement dated March 31, 2020 that asserted that the value of Plaintiff's 200393605 (*i.e.*, the Third 2019 Investment) account had declined by a further $23,665.12 between January 1, 2020 and March 31, 2020— from $158,190.05 to $134,524.93.  (Ex. L.)  Additionally, Equity advised Plaintiff that Equity had claimed $5,027.79 from Plaintiff during this period due to "sweeps" of Plaintiff's 200393605 account that occurred during that same period.  (*Id.*)

58.     During discovery in this case, Plaintiff, via counsel, intends to investigate the parameters and precise nature of the relationship and dealings between Equity and HGG.

59.     Also according to Equity, the value of Plaintiff's 200393603 account (*i.e.*, the Second 2019 Investment) declined by a further $4,829.10 between January 1, 2020 and March 31, 2020.  (Ex. M.)  Equity further advised Plaintiff that Equity had claimed $97.82 from Plaintiff during this period due to "sweeps" of Plaintiff's 200393603 account that occurred during that same period.  (*Id.*)

60.     Roughly contemporaneous with the First, Second, and Third 2019 Investments, Plaintiff requested of HGG by phone that HGG arrange with Equity to make periodic cash

17

disbursements to Plaintiff of $2,000.00 per month, with 10% to be withheld as a tax withholding, in light of Plaintiff's status as a retiree without occupational income; to pay for such distributions. Plaintiff agreed to permit gold and silver assets associated with his Equity accounts to be periodically sold to HGG, at a fair market price, in amounts and at prices necessary to fund the disbursements.

61.     Equity distributed a total of $10,820.00 in cash to Plaintiff between October 22, 2019, and April 3, 2020, pursuant to this arrangement.

62.     To fund such cash distributions, Equity Trust caused to be sold, from Plaintiff's holdings, to HGG, the following of Plaintiff's gold coin holdings: 5 Gold Canada Maple Leaf Grey Falcon 2016 coins (1/4 oz.), on November 5, 2019; 5 Gold Canadian Buffalo 2019 coins (1/4 oz), on January 7, 2020; 5 Gold Canadian Buffalo 2019 coins on Jan. 14, 2020; and 24 gold Canada Maple Leaf Grey Falcon 2016 coins (1/4 oz.), on February 13, 2020.

63.     Upon information and belief, HGG purchased these coins back from Plaintiff at or near the then-prevailing spot market price for gold, as opposed to the wildly-inflated prices for which Defendant had just sold the same coins to Plaintiff merely weeks earlier.

**NON-PAYMENT FOR REPURCHASED COINS**

64.     According to information supplied by Equity since Plaintiff and Ms. Roy discovered the nature and magnitude of Plaintiff's losses, though HGG re-assumed ownership on January 7, 2020 of those 5 Gold Canadian Buffalo 2019 coins referenced above at Paragraph 62 (which HGG had originally sold to Plaintiff as part of the Third Investment), HGG never made payment to fund the repurchase of those coins.

## PLAINTIFF'S STEPS TO ADDRESS AND MITIGATE
## THE HARM CAUSED BY DEFENDANTS' FRAUD AND CONVERSION

65.     Once he became aware of it, Plaintiff, with the assistance of his attorney-in-fact (and girlfriend) Ms. Roy, brought the fact of Defendants' fraud to HGG's attention via phone and email on March 26, 2020, and with follow-up emails and phone calls through the remainder of March 2020 and April 2020.  Defendants refused to acknowledge, and took no steps to rectify their acts of theft and fraud.

66.     Deeply alarmed at the sudden and precipitous loss of a substantial portion of his retirement savings, in order to mitigate Mr. Mathys' losses, in April 2020, Plaintiff and Ms. Shirley Roy— acting with Power of Attorney for Mr. Mathys— sought out a buyer to which to sell Plaintiff's gold and silver purchased from HGG.

67.     Accounting for the asset sales by Equity to HGG to fund the $10,820.00 in distributions made to Plaintiff, as of April 24, 2020, Plaintiff's holdings from his 2019 Investments consisted of:

a.      **First 2019 Investment**

|  | **Qty** |
|---|---|
| **Gold** | |
| Gold Canadian Buffalo, 2019 - .25oz | 69 |
| Gold Canadian Buffalo - .25 oz | 31 |
| | |
| **Silver** | |
| Silver Canadian Buffalo | 400 |
| Silver Canadian Buffalo | 2,800 |
| Silver Canadian Polar Bear and Cub - 1.5 oz | 95 |

b.      **Second 2019 Investment**

**Gold**

| | |
|---|---|
| Gold Canadian Buffalo, 2019 - .25 oz | 25 |
| Gold Canadian Buffalo - .25oz | 5 |

**Silver**

| | |
|---|---|
| Silver Canadian Round Buffalo, 2019 - 1.25 oz | 800 |
| Silver Bullion Round, Rose Crown Shield Guinea - 1.25 oz | 361 |

        c.     **<u>Third 2019 Investment</u>**

**Gold**

| | |
|---|---|
| Gold Bullion Round Rose Crowned Shield Guinea - .25 oz | 42 |
| Gold Canadian Maple Leaf Grey Falcon 2016 - .25 oz | 37 |
| Gold Canadian Buffalo, 2019 - .25 oz | 37 |

**Silver**

| | |
|---|---|
| Silver Canadian Round Buffalo, 2019 - 1.25 oz | 2,800 |
| Silver Bullion Round, Rose Crown Shield Guinea - 1.25 oz | 1,808 |

68.     In the first half of April 2020, Ms. Roy, on Plaintiff's behalf, began a process of seeking to obtain a buyer for Plaintiff's gold and silver assets.   In this regard, Ms. Roy communicated with representatives from three potential purchasing entities: Delaware Valley Rare Coin Company of Pennsylvania, OWNx of Kansas, and American Bullion, Inc. of Los Angeles, California.

69.     On April 24, 2020, a fourth potential buyer, Advantage Gold LLC of Los Angeles, California, quoted Plaintiff and Ms. Roy a value of $258,499.86 to purchase such remaining holdings from Plaintiff's 2019 Investments.

70.     Between April 24, 2020 and April 27, 2020, Advantage elected not to purchase the 1,808 Silver Bullion Round/Rose Crown Shield Guinea (1.25 oz)  coins purchased by Plaintiff as

part of the Third 2019 Investment, asserting that they (Advantage) could not ascertain the physical location of the coins. On April 27, 2020, Advantage accordingly dropped its offer for the assets acquired with the 2019 Investments by $31,629.71, to a total of $226,870.15.

71.     Advantage also offered to purchase those of Plaintiff's holdings acquired with his 2018 Investment for $28,959.43.

72.     Advantage characterized the foregoing offers for Plaintiff's assets acquired with his 2018 Investment and the 2019 Investments as fair market prices for Plaintiff's assets.

73.     Describing to Plaintiff and Ms. Roy the value of Plaintiff's 2019-purchased assets, Advantage's representative explained that the semi-numismatic coins in particular among Plaintiff's holdings were so specialized as to have an extremely narrow and limited market of potential buyers— directly contrary to Defendant HGG's representation that those coins "earn substantial premiums above and beyond the metal's bullion [*i.e.*, intrinsic] value simply due to the fact that the coin issue is extremely hard to find." (Ex. D at 6.)

74.     Plaintiff and Ms. Roy consummated a sale of all of Plaintiff's gold and silver holdings remaining as of April 27, 2020— save for the 1,808 Silver Bullion Round/Rose Crown Shield Guinea (1.25 oz)  coins— to Advantage, on April 27, 2020, for $255,829.58.

75.     In late May 2020, a representative of Advantage advised Plaintiff that with follow up effort, they had ascertained the location of the 1,808 Silver Bullion Round/Rose Crown Shield Guinea (1.25 oz) coins.  Advantage agreed to pay $34,171.20 to Plaintiff to purchase the coins. That purchase was consummated on May 28, 2020.

**THE OCTOBER 29, 2019 "SHIPPING AND TRANSACTION AGREEMENT"**

76.     Well after Plaintiff completed the First 2019 Investment, and after he had sent HGG payments for the Second and Third Investments, HGG sent to Plaintiff a boilerplate document

dated October 29, 2019, labeled a "Shipping and Transaction Agreement" (Ex. N), and asked that

he sign it. He did.

77.     Plaintiff did not have advice of counsel prior to signing the Shipping and

Transaction Agreement.

78.     Among its provisions, the October 29, 2019 Shipping and Transaction Agreement

provided:

> The purchase price Customer agrees to pay includes HGG's profit margin
> on that transaction. The difference between HGG's actual cost of the
> precious metals on the day of the Customer's purchase and the retail price
> quoted to Customer is called the 'Spread.'…
>
> On the date this agreement was offered to Customer, HGG's Spread on (i)
> bullion was between two and fifteen percent (2-15%); and (ii) semi-
> numismatic and numismatic coins was between five and thirty five percent
> (5-35%). The Spread on Hartford exclusive coins is the same as for semi-
> numismatic and numismatic coins: between five and thirty five percent (5-
> 35%). However, these percentages vary, and the actual Spread on any
> specific transaction may be outside the stated typical ranges.

(Ex. N at 2, ¶¶ 4(A), (B).)

79.     On or before October 29, 2019, no person at HGG ever advised Mr. Mathys that

HGG intended to retain over 50% of Plaintiff's First, Second, and Third 2019 Investments as a

"profit margin," nor as compensation for ostensible services rendered, nor for any other reason or

ostensible purpose.

80.     The October 29, 2019 Shipping and Transaction "Agreement" also contained a

dispute resolution provision that included an arbitral delegation clause:

> Any dispute, claim, or controversy arising out of this Agreement or
> otherwise between HGG and the Customer, including but not limited to the
> breach, termination, enforcement, interpretation, or validity of this
> Agreement and the scope and applicability of the agreement to arbitrate
> contained in this paragraph, shall be determined by arbitration before the
> Judicial Arbitration and Mediation Service ('JAMS') office closest to
> Customer's principal place of residence before one arbitrator who shall be
> a retired judicial officer. Any claim asserted by the Customer will not be

22

joined, for any purpose, with the claim or claims of any other person or entity. The arbitration shall be administered by JAMS pursuant to the rules promulgated by JAMS. The laws of the state of the residence of the Customer shall govern the substantive rights of the parties. The arbitration shall be final and binding, and judgment on the award may be entered in any court having jurisdiction. Customer understands that by agreeing to arbitration, the Customer is waiving all rights to seek remedies in court, unless otherwise mandated by federal or state laws. This clause will not prohibit the parties from seeking the provisional remedies in any court of competent jurisdiction. ANY CLAIM OR LEGAL PROCEEDING HEREUNDER SHALL BE FILED WITHIN ONE YEAR OF ITS ACCRUAL. BY AGREEING TO ARBITRATE ANY CLAIM OR DISPUTE PURSUANT TO THIS PARAGRAPH 12, THE PARTIES WAIVE ANY RIGHTS THEY MAY OTHERWISE HAVE TO A COURT OR JURY TRIAL. This paragraph shall survive termination of this Agreement.

(Ex. N at 4, ¶ 12.)

## EQUITY TRUST RETAINS A SIGNIFICANT PORTION OF PLAINTIFF'S FUNDS FOR EIGHT WEEKS

81. After consummating the sale of Plaintiff's gold and silver holdings with Advantage in May 2020 for a total of $290,000.78, since then, Plaintiff— having lost all trust in HGG and the financial institutions (particularly Equity Trust) whose accounts HGG assisted in arranging to be opened in Plaintiff's name— has sought to remove all those funds held in Plaintiff's name at Delaware Depository and Equity Trust. Delaware Depository promptly complied with Plaintiff's requests for withdrawal of Plaintiff's funds.

82. While complying with Plaintiff's request to withdraw all those of Plaintiff's funds held in the 200393603 account, Equity Trust failed and refused for several weeks to disburse Plaintiff's funds from the 200393605 account, notwithstanding several phone calls, emails, as well as written requests mailed to Equity Trust via UPS, throughout the months of June and July 2020. Equity Trust only finished disbursing to Plaintiff all funds from Plaintiff's 200393605 account on July 27, 2020 after a delay of nearly eight weeks, and without any meaningful explanation for the cause for the eight-week delay in disbursement.

23

**COUNT I: DECLARATORY JUDGMENT (ARBITRAL DELEGATION CLAUSE OF OCTOBER 2019 AGREEMENT INAPPLICABLE AND UNCONSCIONABLE, AND MANDATORY ARBITRATION PROVISION INAPPLICABLE AND UNCONSCIONABLE)**

83.    Each of the preceding allegations are incorporated by reference.

84.    Plaintiff seeks declaratory judgment that the arbitral delegation clause set forth in the October 29, 2019 Shipping and Transaction Agreement providing:

> "[a]ny dispute, claim, or controversy arising out of this Agreement or otherwise between HGG and the Customer, *including but not limited to* the breach, termination, enforcement, *interpretation, or validity of* this Agreement and *the scope and applicability of the agreement to arbitrate contained in this paragraph*,…shall be determined by arbitration before the Judicial Arbitration and Mediation Service…" (emphasis added),

is inapplicable to the instant dispute and unconscionable were it to be applied to the instant dispute.

85.    The October 29, 2019 Shipping and Transaction Agreement was sent to Plaintiff and executed after the First, Second, and Third Investments were made, and is not co-signed by anyone from Defendant HGG.

86.    The October 29, 2019 Shipping and Transaction Agreement was not signed by Plaintiff until after the First 2019 Investment was consummated, and therefore the arbitral delegation clause thereunder is wholly inapplicable as to Plaintiff's claims that pertain to that First 2019 Investment.

87.    As well, it is inapplicable as to Plaintiff's claims against Defendant David Wolan, who is not a named party in his individual capacity to the October 29, 2019 Shipping and Transaction Agreement— even if he were a signatory to that "Agreement" (which he is not).

88.    Additionally, the arbitral delegation clause contained in the October 29, 2019 Shipping and Transaction Agreement was both procedurally and substantively unconscionable.

89.    Procedurally, Plaintiff was of an extremely advanced age as of the date of contracting, was not represented by counsel, and was unable to, and did not, appreciate the

potential consequences of the arbitral delegation clause itself. Plaintiff has experienced cognitive decline, as observed by Plaintiff's Attorney-in-Fact Ms. Roy and as evident to Ms. Roy, who is a licensed physician and who lives with Plaintiff, on dates in 2019, including in September 2019.

90. Substantively, the arbitral delegation clause is unconscionable, *inter alia*, because Plaintiff is a retiree of advanced age— with no occupational income— whose retirement savings have already been badly depleted by Defendants' fraud, and would be further depleted by paying the JAMS filing fee ($1,750 for two party matters, and $3,000 for three-party matters) and JAMS arbitrator fees (typically $400/hour and upward) if for the purpose of JAMS to decide the arbitrability of certain, or all, of Plaintiff's claims. Additionally, if JAMS were to weigh, and then elect to retain, jurisdiction over some or all of this matter, Plaintiff's prerogative to gather evidence supporting his case would be significantly impaired and harmed. Plaintiff expects to seek witness testimony during discovery from witnesses located in other jurisdictions— specifically, Ohio and California. Any deposition notice (or like discovery request) issued under JAMS Rules to an out-of-state third party would not be enforceable under its own terms, and Plaintiff's means of obtaining enforcement of a deposition notice or other discovery request issued under JAMS rules to an out-of-state third party would be significantly more limited than with respect to a subpoena issued to such a third party under the Federal Rules of Civil Procedure.

91. Plaintiff requests that the Court enter declaratory judgment that the arbitral delegation clause set forth in the October 29, 2019 Shipping and Transaction Agreement is inapplicable to the instant dispute and unconscionable were it to be applied to the instant dispute.

92. For the same reasons, the mandatory arbitration provision ("[a]ny dispute, claim, or controversy arising out of this Agreement or otherwise between HGG and the Customer…shall be determined by arbitration before the Judicial Arbitration and Mediation Service ('JAMS') office closest to Customer's principal place of residence…") set forth in the dispute resolution provision

of the October 29, 2019 Shipping and Transaction Agreement is and should be held inapplicable to the instant dispute and unconscionable were it to be applied to the instant dispute. Plaintiff requests that the Court so hold and enter declaratory judgment in Plaintiff's favor.

## COUNT II: BREACH OF IMPLIED CONTRACT (HGG)

93.     Each of the foregoing allegations are incorporated by reference.

94.     As to the First, Second, and Third 2019 Investments, an implied contract existed between Plaintiff and Defendant HGG for Defendant to sell to Plaintiff gold and silver assets at fair market prices, consistent with an investment objective of "protect[ing]" Plaintiff's wealth.

95.     Plaintiff fulfilled all requirements incumbent upon him under the parties' contract, namely, to tender payment to HGG.

96.     Defendant HGG accepted Plaintiff's payments. Defendant breached the parties' implied contract as to each of the First, Second, and Third 2019 Investments by selling Plaintiff silver and gold coins that were not worth even half of what Plaintiff paid HGG.

97.     Plaintiff has been harmed by Defendants' breach. As a result of the breach, Plaintiff has been deprived of over $300,000 of his retirement savings.

## COUNT III: VIOLATIONS OF THE CONSUMER FRAUD DECEPTIVE PRACTICES BUSINESS PRACTICES ACT, 815 ILCS 505/1, *et seq.* (HGG)

98.     The allegations at Paragraphs 1 through 82 are incorporated by reference.

99.     Defendant Wolan's statements and conduct are imputable to HGG.

100.    Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2, prohibits unfair or deceptive acts or practices.

101.    Misrepresentations or the deceptive omissions of a material fact constitute unlawful acts or practices within the meaning of Section 2 of the Illinois Consumer Fraud Act, where made

with the intention that others rely upon the concealment, suppression, or omission of such material fact.

102.    Engaging in a deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact, violates Section 2 of the Illinois Consumer Fraud Act.

103.    In the course of its trade or commerce, and in furtherance of Defendant's own business gains, Defendant engaged in the following unlawful acts or practices in violation of Section 2 and of the Consumer Fraud Act:

a)  Advising Plaintiff that money held at any and all financial institutions in the United States were at imminent risk of a "bail-in," subjecting Plaintiff's own assets to being "fr[ozen]" and then "seized";

b)  Asserting that "If all of history's warning signs are flashing we are in the throat of a recession now, and banks needed trillions to stay in business in 2008 after absolutely fabulous financial times, and now they would be bailed-into using account holders money instead of printed money by the Fed, why would I maintain keeping (sic) funds where they are now trusted to banks or financial advisory firms instead of gold and silver in your account inside a private vault.";

c)  Asserting that GDP figures from China were "horrific," and bore some potential causal risk of destroying the value of Plaintiff's retirement investments;

d)   Describing the then-contemporaneous economic environment (as of September 2019) as "damn scary";

e)  Asserting that "things are going to be extremely tough for our retirees";

f) By asserting that "[s]ome specific coins can earn substantial premiums above and beyond the metal's bullion value simply due to the fact that the coin issue is extremely hard to find";

g) Asserting that a "stock market bust" was looming;

h) Claiming on September 25, 2019 that it was "completely" certain that a financial "crisis" would occur in 2019;

i) Claiming to Plaintiff that investing with HGG would be a good way to "protect [Plaintiff's] wealth";

j) Lying to Plaintiff on three occasions-- in invoices dated October 14, 2019 (one invoice) and October 29, 2019 (two invoices)-- about the value of his assets immediately after purchase of them;

k) Claiming to Plaintiff that he could expect to "earn substantial premiums above and beyond the metal's bullion value simply due to the fact that the coin issue is extremely hard to find" on his coins;

l) omitting that it intended to take a "profit margin" from Plaintiff of over 50% on Plaintiff's investment in the October 2019 Shipping and Transaction Agreement,

all in violation of Section 2 of the Consumer Fraud Act.

## COUNT IV: CONSTRUCTIVE FRAUD (DEFENDANTS HGG AND WOLAN)

104.    The allegations at Paragraphs 1 through 82 are incorporated by reference.

105.    Plaintiff reposed trust and confidence in each of Defendants HGG and Wolan. HGG and Wolan, jointly and independently, each gained a resulting influence and superiority over Plaintiff.  Given, *inter alia*, his advanced age, Plaintiff was the subservient party.

106.    Each of Defendants HGG and Wolan engaged in a pattern of conduct toward Plaintiff calculated to deceive, including acts and concealments that entailed a breach of legal or equitable duty, trust, or confidence resulting in damage to Plaintiff.

107.    By advising Plaintiff that money held at any and all financial institutions in the United States were at imminent risk of a "bail-in," subjecting Plaintiff's own assets to being "fr[ozen]" and then "seized," Defendants HGG and Wolan engaged in constructive fraud.

108.    HGG and Wolan engaged in this fraud to instill fear in Plaintiff that would prompt him to liquidate his existing investments and invest that money with HGG. They succeeded.

109.    In reality, a "bail-in" only rises to the status of a real-world event that could be hypothetically actualized in instances of financial institutions in severe distress. Even then it is a remote possibility. There was no evidence whatsoever as of October 2019 that either of the two financial institutions at which Plaintiff held his investments immediately preceding transfer to Defendant HGG, Chase Bank and LPL Financial ("LPL"), were in any sort of severe financial distress. To the contrary, both are, and were, publicly traded entities-- LPL in its own right, and Chase Bank as a subsidiary of JPMorgan Chase). Chase Bank and LPL's financial performance as of Q3 2019 demonstrated healthy balance sheets and strong future outlooks, according to Wall Street analysts.

110.    By asserting that "If all of history's warning signs are flashing we are in the throat of a recession now, and banks needed trillions to stay in business in 2008 after absolutely fabulous financial times, and now they would be bailed-into using account holders money instead of printed money by the Fed, why would I maintain keeping (sic) funds where they are now trusted to banks or financial advisory firms instead of gold and silver in your account inside a private vault," Defendants engaged in constructive fraud.

111.    By asserting that GDP figures from China were "horrific," and bore some potential causal risk of destroying the value of Plaintiff's retirement investments, Defendants engaged in constructive fraud.

112.    By describing the then-contemporaneous economic environment (as of September 2019) as "damn scary," Defendants engaged in constructive fraud.

113.    By asserting that "things are going to be extremely tough for our retirees," Defendants engaged in constructive fraud.

114.    By asserting that "[s]ome specific coins can earn substantial premiums above and beyond the metal's bullion value simply due to the fact that the coin issue is extremely hard to find," Defendants engaged in constructive fraud.

115.    By asserting that a "stock market bust" was looming, Defendants engaged in constructive fraud.

116.    By claiming to Plaintiff that investing with HGG would be a good way to "protect [Plaintiff's] wealth," Defendants engaged in constructive fraud.

117.    By lying to Plaintiff on three occasions about the value of his assets immediately after purchase of them in 2019, Defendant HGG engaged in constructive fraud.

118.    Plaintiff had a fiduciary relationship with each of Defendant Wolan and Defendant HGG.

119.    Defendant Wolan and Defendant HGG breached their duties imposed as a matter of their respective fiduciary relationships with Plaintiff.

120.    Plaintiff suffered damages on account of said breaches, in the form of the loss of more than half of his retirement savings.

### COUNT V: COMMON LAW FRAUDULENT MISREPRESENTATION
### (DEFENDANTS WOLAN AND HGG)

121.    The allegations at Paragraphs 1 through 82 are incorporated by reference.

122.    Defendant Wolan made a fraudulent misrepresentation to Plaintiff when he asserted to Plaintiff that the government was likely to "go after" Plaintiff's retirement monies by first "freez[ing]" and then "seiz[ing]" Plaintiff's assets in the event of a stock market "sell off," which latter such event, Wolan and HGG claimed to Plaintiff, was looming.

123.    Defendant HGG made false assertions to Plaintiff in the October 14, 2019, invoice issued to Plaintiff by asserting that the Silver Canadian Buffalo 1.25 oz Box of 400 coins had a value of $138,941.92, the Gold Canadian Buffalo 0.25-oz Sheet of 20 coins had a value of $69,610.80, the Silver Canadian Polar Bear & Cub 1.5 oz. 2015 coins had a value of $2,861.36, and the Silver Canadian Polar Bear & Cub 1.5 oz 2015 coins had a value of $24.60 (totaling $211,438.68).   Each asset's actual value was significantly less than what Defendant HGG represented to Plaintiff, and indeed, less than half of what Defendant HGG represented to Plaintiff.

124.    Defendant HGG made false assertions to Plaintiff in the October 29, 2019, invoice issued to Plaintiff by asserting that the Gold Canadian Buffalo 0.25 oz coins had a value of $20,819.10, the Silver Canadian Buffalo 1.25-oz Box of 400 coins had a value of $34,911.80, the Silver Rose Crown Guinea 1.25-oz coins had a value of $15,433.20, and Silver Rose Crown Guinea 1.25-oz coins had a value of $30.87 (totaling $71,194.97).  Each asset's actual value was significantly less than what Defendant HGG represented to Plaintiff, and indeed, less than half of what Defendant HGG represented to Plaintiff.

125.    Defendant HGG made false assertions to Plaintiff in the second October 29, 2019, invoice issued to Plaintiff by claiming that the Gold Canadian Gyrfalcon .25 oz 2016 coins had a value of $28,629.48, the Gold Rose Crown Guinea .25 oz coins had a value of $28,756.56, the

Gold Canadian Buffalo 0.25 oz coins had a value of $29,145.90, the Silver Canadian Buffalo 1.25 oz Box of 400 coins had a value of $122,185.42, the Silver Rose Crown Guinea 1.25 oz coins had a value of $77,466.09, and the Silver Rose Crown Guinea 1.25 oz coins had a value of $2.84 (totaling $286,186.29). Each asset's actual value was significantly less than what Defendant HGG represented to Plaintiff, and indeed, less than half of what Defendant HGG represented to Plaintiff.

126.    HGG was aware of the falsity of each foregoing representation as set forth in the October 14, 2019, invoice and two October 29, 2019, invoices when the invoices were issued. Plaintiff was not aware of the falsity of those representations.

127.    HGG intended that Plaintiff rely upon Defendants' representations in each of the three October 2019 invoices, by continuing to give HGG more money. Wolan intended that Plaintiff rely on Wolan's misrepresentation to Plaintiff when he asserted to Plaintiff that the government was likely to "go after" Plaintiff's retirement monies by first "freez[ing]" and then "seiz[ing]" Plaintiff's assets in the event of a stock market "sell off," which latter such event, Wolan and HGG claimed to Plaintiff, was looming.

128.    Plaintiff reasonably relied on Wolan and HGG's misrepresentations, which were material in nature. Had Plaintiff known of the nature of HGG's misrepresentations, he would not have transacted with HGG.

129.    Plaintiff has been harmed by Wolan's conduct as alleged.

130.    Plaintiff has been harmed by HGG's conduct as alleged.

131.    Wolan and HGG's statements constituted intentional misrepresentation under Illinois common law.

**COUNT VI: CONVERSION (HGG)**

132.    The allegations at Paragraphs 1 through 82 are incorporated by reference.

133.     Defendant HGG had no right and entitlement, by contract, law, or equity, to retain a "profit margin" of over 50% on Plaintiff's investment of his life savings.  Defendant HGG's outrageous "profit margin" is dressed-up jargon for theft.

134.      The funds transferred by Plaintiff to Defendant for investment purposes comprise property.

135.     Defendant HGG intentionally and substantially interfered with Plaintiff's funds by taking funds and misappropriating funds for its own use and enjoyment.

136.     Plaintiff did not consent in any manner to either Defendant taking the funds at issue for its own use.

137.      Defendant HGG has failed to return the converted funds to Plaintiff.

138.      Plaintiff has been damaged in an amount to be proven at trial as a result of Defendant's actions in converting and misappropriating the transferred funds.

139.     Additionally, as alleged, Defendant HGG has converted to its own personal use and benefit 5 of the 42 Gold Canadian Buffalo coins that it claimed to have sold to Plaintiff as part of the Third Investment.

140.     Plaintiff has been damaged in an amount to be proven at trial as a result of Defendant's actions in converting and misappropriating the 5 missing Gold Canadian Buffalo coins.

## COUNT VII: VIOLATION OF 815 ILCS 5/12 (WOLAN)
## (ILLINOIS SECURITIES LAW)

141.     The allegations at Paragraphs 1 through 82 are incorporated by reference.

142.     Wolan was aware that Plaintiff stood to liquidate his stock holdings in order to fund his investment with Defendant HGG.  During the course of several phone conversations, he urged Plaintiff to do so.

143.    Wolan was an investment adviser within the meaning of 815 ILCS 5/2.11 as a person who, for compensation, engaged in Illinois in the business of advising Plaintiff as to the "advisability of" "selling securities."

144.    Wolan engaged in a practice, or course of business which operated as a fraud or deceit upon a client or prospective client (815 ILCS 5/12(J)(2)), including by falsely suggesting to Plaintiff that his retirement funds were at risk of being frozen or seized as part of a "bail-in," and by urging Plaintiff to heed the following guidance:

> "If all of history's warning signs are flashing we are in the throat of a recession now, and banks needed trillions to stay in business in 2008 after absolutely fabulous financial times, and now they would be bailed-into using account holders money instead of printed money by the Fed, why would I maintain keeping (sic) funds where they are now trusted to banks or financial advisory firms instead of gold and silver in your account inside a private vault.",

which worked a further fraud on Plaintiff.

145.    Wolan also failed to advise Plaintiff that HGG would retain over 50% of Plaintiff's First, Second, and Third 2019 Investments as a "profit margin," nor as compensation for ostensible services rendered, nor for any other reason or ostensible purpose.

146.    Via his misrepresentations and omissions, and conduct, collectively falsely conveying to Plaintiff that investing with HGG would be a good way to "protect [Plaintiff's] wealth," Wolan also violated 815 ILCS 5/12(G), providing that it is a violation of the Illinois Securities Law to obtain money or property through the sale of securities by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

## COUNT VIII: REFORMATION ON GROUNDS OF UNCONSCIONABILITY (HGG) (PLED IN THE ALTERNATIVE TO COUNT II)

147.    The allegations at Paragraphs 1 through 82 are incorporated by reference.

148. As to Plaintiff's Second and Third 2019 Investments, in the alternative to Plaintiff's Count II, Plaintiff seeks reformation of the October 29, 2019 Shipping and Transaction Agreement by the Court.

149. Specifically, Plaintiff requests that the Court supply to the October 29, 2019 Shipping and Transaction Agreement a "profit margin" reasonable under the circumstances.

150. Plaintiff requests an award, as damages, of the difference between the "profit margin" supplied by the Court to the Second and Third 2019 Investments and that profit margin retained by Defendant HGG on those transactions (again, upon information and belief, a margin exceeding 50%).

## COUNT IX: BREACH OF WRITTEN CONTRACT (BREACH OF THE DUTY OF THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING) (HGG) (PLED IN THE ALTERNATIVE TO COUNTS II AND VIII)

151. The allegations at Paragraphs 1 through 82 are incorporated by reference.

152. As to Plaintiff's Second and Third 2019 Investments, in the alternative to Plaintiff's Counts II and VIII, Plaintiff pleads breach by Defendant HGG of the October 29, 2019 Shipping and Transaction Agreement.

153. In each contract, there is implied a duty of good faith and fair dealing.

154. Defendant HGG breached the duty of good faith and fair dealing implied in the October 29, 2019 Shipping and Transaction Agreement, *inter alia*, by retaining, but failing to affirmatively disclose that it would retain, a profit margin exceeding 50% on the Second and Third 2019 Investments.

155. Plaintiff fulfilled all requirements incumbent upon him under the parties' contract, namely, to tender payment to HGG.

156. Plaintiff has been harmed by Defendant's breach, in an amount to be determined at trial.

**COUNT X: DECLARATORY JUDGMENT (ARBITRAL DELEGATION CLAUSE OF DECEMBER 2018 AGREEMENT INAPPLICABLE AND UNCONSCIONABLE, AND MANDATORY ARBITRATION PROVISION INAPPLICABLE AND UNCONSCIONABLE)**

157.    The allegations at Paragraphs 1 through 82 are incorporated by reference.

158.    Prior to signing the October 29, 2019 Shipping and Transaction Agreement, Plaintiff signed a December 12, 2018 Shipping and Transaction Agreement with Defendant HGG (Ex. O).

159.    That December 12, 2018 Agreement contained a dispute resolution provision worded identically to that set forth above at Paragraph 80 of Plaintiff's First Amended Complaint.

160.    Plaintiff seeks declaratory judgment that the arbitral delegation clause set forth in the December 12, 2018 Shipping and Transaction Agreement providing:

> "[a]ny dispute, claim, or controversy arising out of this Agreement or otherwise between HGG and the Customer, *including but not limited to* the breach, termination, enforcement, *interpretation, or validity of* this Agreement and *the scope and applicability of the agreement to arbitrate contained in this paragraph*,…shall be determined by arbitration before the Judicial Arbitration and Mediation Service…" (emphasis added),

is inapplicable to the instant dispute and unconscionable were it to be applied to the instant dispute.

161.    The December 12, 2018 Shipping and Transaction Agreement, which is not co-signed by anyone at HGG, was sent to Plaintiff ten months before the First, Second, and Third 2019 Investments were made, and at a juncture at which none of those investments were contemplated by the parties.

162.    There is no discussion in the December 12, 2018 Shipping and Transaction Agreement of any of the First, Second, and Third 2019 Investments.  The arbitral delegation clause thereunder is inapplicable as to Plaintiff's claims in this case.

163.    As well, the arbitral delegation clause of the December 12, 2018 Shipping and Transaction Agreement is inapplicable as to Plaintiff's claims against Defendant David Wolan,

who is not a named party in that agreement in his individual capacity— even if he were a signatory to that "Agreement" (which he is not).

164.    Additionally, the arbitral delegation clause contained in the December 12, 2018 Shipping and Transaction Agreement was both procedurally and substantively unconscionable.

165.    Procedurally, Plaintiff was of an extremely advanced age as of the date of contracting, was not represented by counsel, and was unable to, and did not, appreciate the potential consequences of the arbitral delegation clause itself.  Plaintiff has experienced cognitive decline, as observed by Plaintiff's Attorney-in-Fact Ms. Roy and as evident to Ms. Roy, who is a licensed physician and who lives with Plaintiff, including as early as December 2018.

166.    Substantively, the arbitral delegation clause is unconscionable, *inter alia*, because Plaintiff is a retiree of advanced age— with no occupational income— whose retirement savings have already been badly depleted by Defendants' fraud, and would be further depleted by paying the JAMS filing fee ($1,750 for two party matters, and $3,000 for three-party matters) and JAMS arbitrator fees (typically $400/hour and upward) if for the purpose of JAMS to decide the arbitrability of certain, or all, of Plaintiff's claims.  Additionally, if JAMS were to weigh, and then elect to retain, jurisdiction over some or all of this matter, Plaintiff's prerogative to gather evidence supporting his case would be significantly impaired and harmed.   Plaintiff expects to seek witness testimony during discovery from witnesses located in other jurisdictions— specifically, Ohio and California.  Any deposition notice (or like discovery request) issued under JAMS Rules to an out-of-state third party would not be enforceable under its own terms, and Plaintiff's means of obtaining enforcement of a deposition notice or other discovery request issued under JAMS rules to an out-of-state third party would be significantly more limited than with respect to a subpoena issued to such a third party under the Federal Rules of Civil Procedure.

167.    Plaintiff requests that the Court enter declaratory judgment that the arbitral delegation clause set forth in the December 12, 2018 Shipping and Transaction Agreement is inapplicable to the instant dispute and unconscionable were it to be applied to the instant dispute.

168.    For the same reasons, the mandatory arbitration provision ("[a]ny dispute, claim, or controversy arising out of this Agreement or otherwise between HGG and the Customer…shall be determined by arbitration before the Judicial Arbitration and Mediation Service ('JAMS') office closest to Customer's principal place of residence…") set forth in the dispute resolution provision of the December 12, 2018 Shipping and Transaction Agreement is and should be held inapplicable to the instant dispute and unconscionable were it to be applied to the instant dispute.  Plaintiff requests that the Court so hold and enter declaratory judgment in Plaintiff's favor.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff does hereby request that the Court enter declaratory judgment that:

- the arbitral delegation clause set forth in the October 29, 2019 Shipping and Transaction Agreement is inapplicable to the instant dispute and unconscionable were it to be applied to the instant dispute, and

- that the mandatory arbitration provision of the October 29, 2019 Shipping and Transaction Agreement is inapplicable to the instant dispute and unconscionable were it to be applied to the instant dispute.

- the arbitral delegation clause set forth in the December 12, 2018 Shipping and Transaction Agreement is inapplicable to the instant dispute and unconscionable were it to be applied to the instant dispute, and

- that the mandatory arbitration provision of the December 12, 2018 Shipping and Transaction Agreement is inapplicable to the instant dispute and unconscionable were it to be applied to the instant dispute.

Plaintiff further requests that the Court order Defendants HGG and Wolan to pay Plaintiff:

- Judgment for an amount to be determined by a jury at trial of this matter, for all damages suffered by Plaintiff;

- an award of pre-judgment interest;

- an award of attorneys' fees;

- an award of punitive damages;

- an award of litigation costs;

and an award of such other relief as the Court should consider necessary and proper.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands trial by jury for all of the issues pled so triable.

Respectfully submitted,

_____/s/_____

W. Clifton Holmes
The Holmes Law Group, Ltd.
350 N. Orleans St.
Suite 9000N
Chicago, IL 60654
holmes@theholmeslawgroup.com
(312) 721-0779 (t)
Counsel for Plaintiff John Mathys

August 3, 2020