**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JOHN MATHYS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 20cv03927-CPK-JTG |
| | ) |
| THE HARTFORD GOLD | ) |
| GROUP, LLC | ) |
| d/b/a | ) |
| AMERICAN HARTFORD GOLD | ) |
| GROUP, | ) |
| | ) |
| and | ) |
| | ) |
| DAVID WOLAN, | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF JOHN MATHYS' OPPOSITION TO DEFENDANTS'**
**AUGUST 10, 2020 MOTION TO COMPEL ARBITRATION AND**
<u>**DISMISS OR STAY PROCEEDINGS**</u>

Plaintiff John Mathys submits the instant Opposition to the August 10, 2020 Motion to Compel Arbitration and Dismiss or Stay Proceedings filed by Defendants Hartford Gold Group LLC ("HGG" or "Hartford") and David Wolan (Dkt. 13). For the reasons set forth below, the Court should deny Defendants' Motion.

## BACKGROUND

HGG holds itself out as an investment advisor. Dkt. 10 (First Am. Compl.) ("FAC") ¶9.[1] It claims to "help[] individuals…protect their wealth." FAC ¶3. It did the opposite to Plaintiff. HGG attacked Plaintiff's wealth, defrauding and stealing hundreds of thousands of dollars from him. Along with an array of other false representations, to accomplish their ends, as alleged, Defendants falsely asserted to Plaintiff that his retirement savings were at imminent risk of being "fr[ozen] and seized" by the government— notwithstanding there is not a single recorded instance of such an event having occurred in the history of American banking to an innocent account holder (such as Mr. Mathys) who has not been accused of any wrongdoing.

Defendant HGG is owned by the family of Founder Sanford Mann, a former realtor who founded the company in 2015. FAC, ¶¶3, 4. HGG announced in March 2020 that it would henceforth be known as "American Hartford Gold Group." FAC, ¶5.[2]

Plaintiff is an eighty-three year old retiree who resides in Chicago. FAC, ¶2; Ex. A¶¶1, 2. He first invested $35,000 with Defendant HGG in December 2018. FAC, ¶10. Once Defendants had Plaintiff in their sights, as alleged, they commenced an aggressive, months-long marketing campaign throughout 2019 intended to solicit and obtain the entirety of Plaintiff's savings (nearly $600,000)

---

[1] *See, e.g.,* https://insurancenewsnet.com/oarticle/investor-alert-last-chance-to-open-an-ira-for-2017-tax-benefits#.XyQ2nZ5KjIU (Apr. 9, 2018) (HGG press release) ("Investor Alert: Last Chance to Open An IRA for 2017 Tax Benefits") ("Hartford Gold Group has issued an Investor Alert [which] warn[s] retirement investors…").

[2] There is no indication that HGG recorded the name change with the California Secretary of State.

as an "investment." FAC ¶10. In October 2019, HGG sold Plaintiff gold and silver coins in three tranches (described and defined in Plaintiff's First Amended Complaint as the "First, Second, and Third 2019 Investments" for pleading purposes). The coins that Defendant sold to Plaintiff were worth only roughly half of what HGG represented to Plaintiff, *see* FAC ¶¶15-24, and Plaintiff thus sustained all his losses in this case immediately upon consummation of his investments on October 11, 2019 and October 29, 2019. FAC, ¶¶30, 49, 53, 123, 124, 125. As further alleged, it was not until several months later, in March 2020, that Plaintiff first received information by which he and his attorney-in-fact could ascertain that Defendants had defrauded him. FAC, ¶¶41, 47.

## ARGUMENT

Defendants ask this Court to order arbitration of Plaintiff's claims of conversion, breach of implied contract, Illinois Consumer Fraud Deceptive Business Practices Act violations, constructive fraud, fraudulent misrepresentation, and violations of the Illinois Securities Law.[3] Specifically, Defendants urge that Section 3 of the Federal Arbitration Act ("FAA") (9 U.S.C. § 3) compels this result. Defs.' Mot. at 6. But Defendant David Wolan has no standing to ask this Court to compel arbitration of Plaintiff's claims against him, as he is not a party to either agreement that he cites as a potential basis for arbitration. As discussed below, as to Defendant HGG, it would be procedurally and substantively unconscionable for the Court to compel arbitration of Plaintiff's claims against it. JAMS arbitration represents an extremely expensive proposition to which Plaintiff— a retiree of advanced age with no future expected occupational income streams— did not knowingly assent, and to which Plaintiff lacked the capacity to assent. As well, if Plaintiff's claims against HGG were

---

[3] Plaintiff has alleged breach of implied contract (Count II), violations of the Consumer Fraud Deceptive Practices Business Practices Act (Count III), constructive fraud (Count IV), common law fraudulent misrepresentation (Count V), conversion (Count VI), and breach of written contract against HGG (Count IX) (as well as requesting reformation in the alternative to breach of implied contract, Count VIII) against HGG, and constructive fraud, fraudulent misrepresentation, and violation of the Illinois Securities Law (Count VII) against Wolan.

referred to arbitration, Plaintiff may be precluded from obtaining vital discovery from out-of-state third parties.

I. **Plaintiff Did Not Agree to Arbitrate With Wolan.**

Plaintiff has alleged that David Wolan, *inter alia*, encouraged Plaintiff to liquidate the stock holdings in his traditional IRA accounts during multiple phone conversations, FAC ¶17, 23, and, further, that Wolan asserted to Plaintiff in writing that the United States Government "will now go after Depositor Accounts [such as Plainitff's]": *i.e.*, that Plaintiff's retirement savings were purportedly at risk of seizure and forfeiture. FAC ¶18.[4] As discussed below, Wolan has no standing to ask that this Court compel Plaintiff to arbitrate his claims against Wolan.

    A. **The Gateway Issue of the Arbitrability of the Dispute With Wolan is Properly Before This Court**

As a threshold issue, the Court must determine whether it, or an arbitrator, should decide the arbitrability of Plaintiff's dispute with Wolan. *Lee v. Uber Techs., Inc.*, 208 F. Supp. 3d 886, 891 (N.D. Ill. 2016). Wolan and HGG cite two agreements as potential bases for an order compelling arbitration: a December 2018 "Shipping and Transaction Agreement" ("STA"), and an October 2019 STA. Defendants decline to specify which agreement they believe compels arbitration.[5] Wolan acknowledges, as he must, that he is neither a party nor signatory to either of these agreements. Def.'s Mot. at 12.

Illinois law governs Wolan's request for arbitration. *CCC Info. Servs. Inc. v. Tractable Inc.*, 2019 WL 2011092 (N.D. Ill. May 7, 2019) ("the Supreme Court has made clear that a nonsignatory's

---

[4] Wolan had previously made this same assertion to Plaintiff by phone. FAC ¶18.
[5] Under Section 4 of the FAA, Defendants must pick one of the STAs. *Wallace v. Red Bull Distrib. Co.*, 958 F. Supp. 2d 811, 817 (N.D. Ohio 2013) ("Defendants argue in their motion as though both agreements [between the parties] could apply [to question of arbitrability]. Then, in their reply, they commit to the RBNA Agreement"). As Plaintiff denies that either STA compels arbitration, Defendants, in failing to specify which one they contend compels that result of compelled arbitration, concede the existence of a disputed issue of material fact. This Court could deny Defendants' Motion on this basis alone. *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002).

right to compel arbitration is governed by state law.") (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631-32 (2009)).[6] Based on the lack of privity between Plaintiff and Wolan, each did not "clearly and unmistakably" agree to arbitrate with the other. *See, e.g., In re Dealer Management Systems Antitrust Litigation*, 362 F. Supp. 3d 510, 526-27 (N.D. Ill. 2019); *Tractable*, 2019 WL 2011092 at *3 ("[g]enerally, under Illinois law, only signatories to an arbitration agreement can move to compel arbitration") (quoting *Applications Software Tech. LLC. v. Kapadia*, 2018 WL 3122173 (N.D. Ill. June 26, 2018)).

In turn, because Plaintiff and Wolan did not clearly and unmistakably agree to arbitrate, this Court may resolve the threshold issue of the arbitrability of Plaintiff's claims against Wolan. *In re Dealer Management Systems*, 362 F. Supp. 3d at 526 ("[g]iven the absence of clear and unmistakable evidence that Plaintiffs agreed to arbitrate arbitrability with nonsignatories, the district court had the authority to decide whether the instant dispute is arbitrable") (quoting *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1127 (9th Cir. 2013)); *see also, e.g.*, *Nat'l Oilwell Varco, L.P. v. Sadagopan*, 2018 WL 276364, at *2 (S.D. Tex. Jan. 3, 2018).

### B. Wolan, as Someone Who is not an Intended Third Party Beneficiary of the Dispute Resolution Provision, Cannot Obtain Arbitration

The chief objective in construing a contract under Illinois law is to give effect to the intent of the parties. *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007). Illinois "follows the objective theory of intent, whereby the court looks first to the written agreement and not to the parties' subjective understandings." *Hampton v. Ford Motor Co.*, 561 F.3d 709, 714 (7th Cir. 2009). Accordingly, "parties to a contract [in Illinois] are presumed to bargain for themselves and only incident[al]ly for

---

[6] Defendants do not recite a proposed governing law in their motion. Though Wolan has not suggested that California law could apply, if he did attempt to suggest as much in reply briefing, he would be equitably estopped from doing so, as each STA (the agreements on which he seeks to rely in requesting arbitration) specifies Illinois law. *See* Ex. N to FAC at 4, Ex. O to FAC at 4.

4

third persons. Those parties not in privity to a contract may only sue to enforce the contract when the language of the contract clearly manifests an intent by the contracting parties to confer a direct benefit on the third party." *General Elec. Capital v. Equifax Svcs.* ("*GE Capital*"), 797 F. Supp. 1432, 1445 (N.D. Ill. 1992) (collecting citations). As summarized by the court in *GE Capital*:

> Two methods may be used to affirmatively identify a party as a third party beneficiary of a contract. First, the contracting parties may expressly name a party as a beneficiary to the contract. Such a provision cannot be implied because "there is a strong presumption that parties to a contract intend that the contract's provisions apply to only them and not to third parties. In order to overcome that presumption, the implication that the contract applies to third parties must be so strong as to be practically an express declaration."

*GE Capital*, 797 F. Supp. 1432, 1445-46 (N.D. Ill. 1992) (citations omitted). Here, Wolan is not "expressly name[d]" "as a beneficiary." Both the December 2018 and October 2019 STAs provide that those agreements are:

> "entered into as of the date above by and *between The Hartford Gold Group LLC* [address omitted] *and you* ('Customer')[.]"

Ex. N to FAC at 1, Ex. O to FAC at 1 (emphasis added). The "parties" to the agreement are expressly defined as "Customer" (Mr. Mathys) and HGG. Likewise, the dispute resolution clause of each agreement states:

> DISPUTE RESOLUTION
> …
> Any dispute, claim, or controversy arising out of this Agreement or otherwise *between HGG and the Customer*…shall be determined by arbitration…

Ex. N to FAC at 4, Ex. O to FAC at 4 (emphasis added).

The second means by which parties may evince an intent to benefit a third party is where the contract "define[s] a third party by description of a class" in the dispute resolution provision. *GE Capital*, 797 F.Supp. at 1446 (citing *Altevogt v. Brinkoetter*, 421 N.E.2d 182 (Ill. 1981)); *see also, e.g.*, *Continental Cas. Co. v. American Nat. Ins. Co.*, 417 F.3d 727, 734 (7th Cir. 2005). This is sufficient for purposes of conferring beneficiary status on a third party if the party seeking beneficiary

5

status "may be identified at the time of performance is due as a member of the class intended to be benefited." *Gen. Elec. Capital*, 797 F. Supp. at 1446 (citing *Altevogt*).

Wolan fails here as well. He has not cited language in the STA dispute resolution provision that specifically references any class of persons, much less a class that could be construed as including him. The provision simply refers to disputes between HGG and Plaintiff.[7] It is the language of these two sections of the STAs— the "parties" and "dispute resolution" sections, taken together— which are conclusive for ascertaining whether Wolan was an intended third party beneficiary. A recent 2017 decision, *Manor v. Copart Inc.*, illustrates this. *Id.*, 2017 WL 4785924 (N.D. Ill. Oct. 24, 2017). In *Manor*, the court explained:

> [the contract] defines "Company" to include its subsidiaries, and requires Plaintiff to arbitrate any claim against the Company. Plaintiff agreed to abide by the [contract] as a condition of employment (either with Copart, Inc. or Copart of Connecticut, Inc.). Copart of Connecticut, Inc., as a subsidiary of Copart, Inc.[,] 'is thus an intended third-party beneficiary' of the [contract's] arbitration clause 'and can enforce it.'

*Manor*, 2017 WL 4785924 at *4 (citations omitted). Wolan can point to no such language in either the "parties" or dispute resolute provisions of the STAs.

Wolan is a non-owner employee of HGG. FAC ¶4,[8] FAC ¶6. Under Illinois law, even an individual who wholly owns a company is not thereby presumed to be an intended third-party beneficiary to a contract entered into by the owned entity. *E.g., Safety Solutions, Inc. v. City of Chicago*, WL 3652446, at *7-8 (N.D. Ill. Aug. 18, 2011). There is thus no viable reading of either the "party" or dispute resolution sections of the STAs by which Wolan could cognizably be deemed a person with whom Mr. Mathys previously agreed to arbitrate a dispute.

---

[7] Additionally, the declaration submitted by Wolan does not specifically state that he was employed by HGG as of December 12, 2018 (the date of the first STA). Dkt. 14-3, ¶2 (generically asserting employment by HGG "[a]t all times relevant").

[8] HGG is a privately-held company, wholly owned by the family of Founder Sanford Mann. FAC ¶4; https://www.americanhartfordgold.com/about-us/.

Wolan relies prominently on Massachusetts law. Def.'s Mot. at 12.[9] This is of no moment: Illinois law is widely recognized as more "stringent" than that of other jurisdictions in its standard for when third parties can claim beneficiary status to a contract term. *Continental Cas. Co.*, 417 F.3d at 735. Applying Illinois law, Plaintiff cannot be compelled to arbitrate claims against a person who was not a counterparty to a previously-signed agreement, no more than Mr. Mathys could be compelled to arbitrate claims against a stranger.

## II. This Court Should Address the Arbitrability of Plaintiff's Claims Against HGG and Decline to Compel Arbitration.

This Court should also address the arbitrability of Plaintiff's dispute with HGG, and hold that the arbitral delegation clause of each STA is unenforceable on grounds of unconscionability.

### A. This Court May Decide the Arbitrability of Plaintiff's Claims Against HGG

As with Plaintiff's claims against Wolan, the Court must determine first who should decide the arbitrability of Plaintiff's claims against HGG. *Lee*, 208 F. Supp. 3d at 891. Illinois law applies to this issue: *inter alia*, both STAs provide for Illinois law as governing law. *See* Ex. N to FAC at 4; Ex. O to FAC at 4.[10] Under Illinois law, where a party asserts unconscionability, the court may resolve whether arbitral delegation language is unenforceable on that ground. *Lee*, 208 F.Supp.3d at 892 ("even if the parties evidenced a clear and unmistakable intent to delegate questions of arbitrability, the delegation clause may be unenforceable if it is unconscionable"). Here, Plaintiff has alleged that the delegation clause of the STAs is procedurally and substantively unconscionable. FAC ¶¶88, 164.[11] A court's "finding of unconscionability may be based on either procedural or

---

[9] *See id.* (citing *Grand Wireless, Inc. v. Verizon Wireless, Inc.*, 748 F.3d 1 (1st Cir. 2014)); *see Grand Wireless*, 748 F.3d at 12 n.26 (describing that court was applying Massachusetts law).

[10] *See id.* (providing, "the laws of the state of the residence of the Customer shall govern the substantive rights of the parties").

[11] In each STA, the arbitrability delegation clause provides: "[a]ny dispute, claim, or controversy arising out of this Agreement or otherwise between HGG and the Customer, including but not limited to the breach, termination, enforcement, interpretation, or validity of this Agreement and the scope

7

substantive unconscionability, or a combination of both." *Kinkel v. Cingular Wireless LLC*, 857 N.E.2d 250, 263 (Ill. 2006).

### 1. Applying Illinois law, this Court Should Hold the Delegation Clause of Each STA Procedurally Unconscionable, and That Plaintiff Lacked Capacity

The arbitral delegation clause of each STA should be deemed unenforceable on ground of procedural unconscionability. Under Illinois law, procedural unconscionability:

> "consists of some impropriety during the process of forming the contract depriving a party of a meaningful choice. Factors to be considered are all the circumstances surrounding the transaction[,] including the manner in which the contract was entered into, whether each party had a reasonable opportunity to understand the terms of the contract, and whether important terms were hidden in a maze of fine print; both the conspicuousness of the clause and the negotiations relating to it are important, albeit not conclusive factors in determining the issue of unconscionability."

*Frank's Maintenance & Engineering, Inc. v. C.A. Roberts Co.*, 408 N.E.2d 403, 410 (Ill. 1980). The dispute resolution clause at issue here is printed in a small, single-spaced font (that appears to be Times New Roman 10). Ex. N to FAC at 4, Ex. O to FAC at 4. Plaintiff did not consult with counsel prior to signing either document. Ex. A, ¶6.

Significantly, and closely intertwined with the issues of procedural unconscionability in this case, Plaintiff lacked capacity to meaningfully assent to the terms at issue. The plaintiff's legal capacity is for the court, and not an arbitrator, to decide. *E.g., Amirmotazedi v. Viacom Inc.*, 768 F.Supp.2d 256, 263 (D.D.C. 2011) (summarizing that "district courts, in aftermath of *Buckeye* [*Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (2006)], recognize that challenges to signatory power, including mental capacity defenses, are decided by the court").

Plaintiff, as alleged, has exhibited marked signs of cognitive diminishment dating to December 2018. FAC ¶¶89, 165. This pattern is attested to in detail in the attached declarations of:

---

and applicability of the agreement to arbitrate contained in this paragraph,…shall be determined by arbitration before the Judicial Arbitration and Mediation Service…" FAC ¶¶84, 160.

Mr. Mathys' close friend David Hess (Ex. B); his brother Nicholas Mathys (Ex. C); his girlfriend (with whom he lives), Dr. Shirley Roy (Ex. D); Diane Snow (Ex. E); and in the report dated September 2, 2020 of Dr. Jennifer Wilson-Binotti (Ex. F):

- Mr. Hess has known Plaintiff for some 60 years, and speaks to him regularly. Ex. B, ¶¶3, 7. Mr. Hess has observed that Plaintiff repeats anecdotes from one week to the next by phone. *Id.*, ¶8. Mr. Hess also reports that Mr. Mathys displayed other symptoms of cognitive diminishment over the past five years, such as forgetting where he parked his car in September 2019, and losing track of his belongings. Ex. B, ¶¶9, 10, 11.

- Likewise, Plaintiff's brother Nicholas Mathys reports of similar patterns of Plaintiff repeating anecdotes, and that Plaintiff forgot the location for a planned lunch meeting at a restaurant the following day, Ex. C, ¶6, among other similar episodes. *Id.* ¶5.

- Dr. Roy reports similarly: Mr. Mathys recently mistook a microwave for a TV, Ex. D ¶9 (among other analogous incidents, *e.g.,* Ex. D, ¶¶7, 8).

- Dr. Roy's sister, Diane Snow, reports that among other incidents, while on a four-person vacation with Plaintiff in January of this year, Plaintiff required assistance to alight to the clearly marked entrance of a hotel less than one block away. Ex. E, ¶7.

- Dr. Binotti, of Arlington Heights, Illinois, examined Mr. Mathys on August 27, 2020. She concludes that Mr. Mathys "suffers from cognitive impairments in memory and expressive language, the pattern of which is a classic Alzheimer's profile," Ex. F at 4, a condition that, based on Dr. Binotti's observations, may have begun accelerating for Plaintiff as many as six years ago. *Id.*

- Plaintiff has been on a prescription for memory loss since late February of this year. Ex. A, ¶3.

The breadth and specificity of these attestations and professional observations and conclusions dramatically outweigh the handful of general, self-serving and conclusory testimonial assertions offered by Defendants concerning Plaintiff's capacity as attached to their Motion.

It is clear on such evidence that Plaintiff lacked capacity to meaningfully assent to either of the two arbitration-related contract terms at issue. *See, e.g., Spahr v. Secco*, 330 F.3d 1266, 1268 (10th Cir. 2003) (affirming district court's denial of defendant's motion to compel arbitration, upon finding that plaintiff's dementia deprived plaintiff of capacity to agree to arbitrate); *Gore v. Gadd*, 522 P.2d 212, 213 (1974) (person who lacks "capacity to understand the nature of the act and to

apprehend its consequences" lacks legal capacity to contract). Plaintiff attests in his own affidavit that he did not comprehend the consequences of the mandatory arbitration and delegation of arbitrability clauses of the STAs. Ex. A, ¶¶4-5. The arbitral delegation clause of each STA is, and should be held by this Court to be, invalid on grounds of procedural unconscionability and Plaintiff's lack of capacity.

        2. <u>Applying Illinois law, this Court Should Find the Delegation Clause of Each STA Substantively Unconscionable.</u>

The delegation clause of each STA is also substantively unconscionable. The clause places an excessive financial burden on Plaintiff. Plaintiff would have to pay between $1,750 and $3,000 as initial filing fees to commence JAMS arbitration ($1,750 for two-party arbitration with HGG, $3,000 for three-party arbitration if to include Wolan). https://www.jamsadr.com/arbitration-fees. Once commenced, Plaintiff would have to pay half of the JAMS arbitrator's fees incurred in adjudicating the arbitrability of Plaintiff's claims. *See* https://www.jamsadr.com/rules-comprehensive-arbitration/ (R. 31) ("Each Party shall pay its pro rata share of JAMS fees and expenses as set forth in the JAMS fee schedule in effect at the time of the commencement of the Arbitration"). JAMS commercial arbitrators' hourly rates are substantial, and typically range up to $600 per hour. *Nibler v. Monex Deposit Co.*, 2013 Cal. App. Unpub. LEXIS 3363, at *9 (Cal. 4th App. Dist. 2013) ("the average rate for a JAMS retired judge is between $450 and $600 an hour").

Mr. Mathys is not in a position to generate new occupational income streams for himself. Ex. A ¶7. JAMS' resolution of the gateway arbitral delegation issue would not be instantaneous, as the comparative breadth of the briefing by the parties on the issue before this Court reflects. Given Plaintiff's status as a retiree, forcing him to pay a JAMS filing fee of $1,750 or $3,000 and to then pay a JAMS arbitrator to decide arbitrability, would ineluctably have the result of diminishing the limited total quantum of funds which stand to fund Plaintiff's costs of living in retirement, *see* Ex. D

¶12— and/or to diminish the monies available to his heirs in the event of his passing. Indeed, if JAMS were to rule that Plaintiff's claims against HGG must be arbitrated— which ruling would be consistent with JAMS' own financial self-interest in retaining jurisdiction— Plaintiff would have no opportunity to seek correction of such error in court until conclusion of the entire JAMS arbitration itself, by which juncture Plaintiff would have incurred substantial additional arbitration fees, as discussed further below. Based on the demonstrated financial burden to Plaintiff, the Court should hold the delegation clause of each STA substantively unconscionable and invalid. *Arnold v. Goldstar Fin. Sys.*, 2002 WL 1941546, at *9-10 (N.D. Ill. Aug. 22, 2002).

  B. **The Court Should Deny HGG's Request for Compelled Arbitration of Plaintiff's Claims Against It**

Having ruled that the delegation clause is unconscionable, this Court should proceed to hold that the dispute with HGG is not subject to mandatory arbitration, again on grounds of either procedural or substantive unconscionability, or owing to Plaintiff's lack of capacity.[12]

  1. <u>Applying Illinois law, the Court Should Hold That the Dispute is Not Subject to Compelled Arbitration on Grounds of Procedural Unconscionability, and/or That Plaintiff Lacked Capacity</u>

The Court should hold the dispute resolution provision on the whole, Ex. N to FAC at 5, Ex. O to FAC at 5, invalid for the same reasons set forth by Plaintiff *supra*, at 8-10: as procedurally unconscionable, and/or because Plaintiff lacked capacity to contract to the provisions at issue.

  2. <u>Applying Illinois law, the Court Should Hold That the Dispute is Not Subject to Compelled Arbitration on Grounds of Substantive Unconscionability</u>

For the same underlying reasons described above, the Court should separately hold that it would be substantively unconscionable to compel arbitration of Plaintiff's claims against HGG. Two

---

[12] To the extent Wolan's request for arbitration were not denied by this Court on the ground that Wolan was not an intended beneficiary of either STA (*supra*, pp. 4-7), Plaintiff urges that the same grounds described *supra* and *infra* (pp. 8-15) as grounds for denying compelled arbitration with HGG should be applied to bar Wolan's request as well.

additional reasons give rise to substantive unconscionability, looking past the gateway question presented by the arbitral delegation clause and to the larger issue of whether Plaintiff's claims against HGG should be heard here, or before JAMS.

First, the burden on Mr. Mathys to split JAMS' considerable commercial arbitrators' fees would become much more pronounced should the entire dispute between Plaintiff and HGG be ordered arbitrated, beyond resolution of the initial who-decides-arbitrability issue. The instant case involves ten counts with multiple defendants, and expected discovery from third parties in multiple out-of-state jurisdictions.[13] Paying a JAMS arbitrator on an ongoing basis in a commercial dispute of this nature is highly likely to yield total arbitrator fees in the tens of thousands of dollars. *Nibler*, 2013 Cal. App. Unpub. LEXIS 3363, at *9 (summarizing that JAMS arbitrator rates of $450 to $600 an hour are not uncommon).[14] Accordingly, and on account of this burden, compelling Plaintiff to arbitrate would be unconscionable. *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 670 (6th Cir. 2003); *Phillips v. Associates Home Equity Services, Inc.*, 179 F. Supp. 2d 840, 847 (N.D. Ill. 2001).[15]

Second, mandating JAMS as the dispute resolution forum for Plaintiff's claims against HGG would be substantively unconscionable because Plaintiff may be precluded from obtaining necessary evidence from third parties if forced to arbitrate. FAC ¶¶90, 166. Such risk is both known and particularized. Specifically, Plaintiff has alleged that, since the 2019 Investments virtually exhausted

---

[13] In addition to Equity, Plaintiff will also likely seek discovery from Advantage Gold LLC of California, which, as alleged, purchased Plaintiff's coins after Plaintiff discovered the fact of Defendants' fraud against him. *See* FAC ¶69.

[14] *Cf.* Prepared Testimony of Cliff Palefsky, Chairman, Securities Industry Arbitration Committee, before the Senate Banking, Housing and Urban Affairs Committee (July 31, 1998), *available at* https://www.sec.gov/comments/df-title-ix/pre-dispute-arbitration/predisputearbitration-16.pdf (noting that in "securities industry arbitration," "a plaintiff may ultimately be liable for tens of thousands of dollars in [arbitral] forum fees even if he or she prevails").

[15] Defendants do not meaningfully deny that Plaintiff would incur considerable arbitration fees. Instead, HGG urges arbitration in part because the time to resolve Plaintiff's claims might be shorter before JAMS. Defs.' Mot. at 13. It is the expenses that present unconscionability, and potential time-to-resolution does not create an 'off-set' against fee unconscionability.

all his retirement savings, he arranged to receive bi-weekly living expense disbursements from Equity Trust Company of Westlake, Ohio ("Equity Trust" or "Equity"). FAC ¶¶60-61. HGG re-purchased coins from Plaintiff to fund these disbursements. FAC ¶62. As further alleged, HGG never paid for five gold coins it re-purchased from Plaintiff in January 2020, causing a net loss to Plaintiff of the value of the coins. FAC ¶64. HGG does not acknowledge that it failed to pay for the subject coins. Pertinent for instant briefing, Equity Trust, an out-of-state third party, possesses salient information critically relevant to— if not dispositive of— this dispute. Equity advised Plaintiff's attorney-in-fact, Shirley Roy, that Equity could not confirm HGG's payment for the five coins at issue, as specifically recited by Ms. Roy in the attached affidavit. FAC ¶64; Ex. D ¶11.

Were Plaintiff to seek discovery from Equity during arbitration, and Equity refused to comply, JAMS would not have jurisdiction to sanction Equity (as a non-party). That scenario is particularly acute here given in part that, as alleged, throughout June and July of this year, Equity failed and refused to comply with Plaintiff's repeated requests for a return of his funds— Plaintiff having "lost all trust" in both Defendants, as well as third parties such as Equity to whom HGG introduced Plaintiff. *See* FAC ¶¶81-82; Ex. D, ¶ 13; *see also* FAC ¶58.[16]

At bottom: if Equity refused to comply with a JAMS-issued subpoena, it is not settled that Plaintiff could obtain the sought-after discovery. *Am. Fed'n of Television & Radio Artists v. WJBK TV*, 164 F.3d 1004, 1009 n.7 (6th Cir. 1999) ("We do not reach the question of whether an arbitrator may subpoena a third party for a discovery deposition relating to a pending arbitration proceeding."); *In re Atmel Corp. v. LM Ericsson Telefon, Ab*, 371 F.Supp.2d 402, 403 (S.D.N.Y. 2005) ( "[t]he weight of judicial authority favors the view that the Federal Arbitration Act, 9 U.S.C. § 7, does not authorize arbitrators to issue subpoenas for discovery depositions against third parties."). By

---

[16] Equity possesses other evidence relevant to this case, including relating to Equity's reporting of losses to Plaintiff arising from an activity known as "sweeps." FAC ¶¶57, 59.

contrast, if Plaintiff's claims proceed here and, during discovery, a recalcitrant out-of-state third party resisted a subpoena for relevant evidence, Plaintiff could avail himself of accepted mechanisms for enforcement of the subpoena in federal court, even out of state.

For these reasons, the Court should hold compelled arbitration an unenforceable and substantively unconscionable condition of the December 2018 and October 2019 STAs.

### 3. In the Alternative, The Court Should Hold That Plaintiff's Claims Against HGG Arising From the First 2019 Investment Fall Outside Arbitration

If the Court declines to hold the dispute resolution provision of each STA unconscionable, or otherwise invalid owing to Plaintiff's lack of capacity, the Court should hold in the alternative that each provision has no bearing on Plaintiff's claims arising from his First 2019 Investment. That investment, totaling $211,739, was consummated on October 11, 2019. FAC ¶26; FAC ¶¶25-35. HGG itself recognized that the December 2018 STA could not create an obligation for Plaintiff to arbitrate any claim arising from his October 2019 investments, which is apparently why HGG sent Plaintiff a new STA for his signature in late October 2019. Regardless, the October 2019 STA states that it "govern[s]" "pending and future precious metals transactions between the parties" (Ex. N to FAC at 1)— *i.e.*, not past transactions, such as the October 11, 2019 investment. Particularly in light of HGG's failure to specify which STA it believes should be held to apply, this Court should, at a minimum, hold that Plaintiff's claims arising from the First 2019 Investment are not subject to arbitration.

### III. The Court Should Ignore Defendants' Extraneous and Bad Faith False Assertions of Fact.

Arbitrability under the FAA is the sole issue raised by Defendants' Motion. Notwithstanding, Defendants have the temerity to extraneously assert that Plaintiff could have enjoyed a "profit" if he had continued holding the coins at issue indefinitely, and for several months after ascertaining that he had been defrauded by Defendants. Defs.' Mot. at 3 n.2.

14

This is akin to a stockbroker asserting he should be absolved of only selling a client half those shares of a company's stock that he claimed to the client he had sold to that client, simply because the underlying stock happened to appreciate after the broker had defrauded his client. As alleged, HGG blatantly lied to Plaintiff in October 2019 about the value of the gold and silver coins HGG had just sold to Mr. Mathys. FAC ¶¶38, 46, 52. Plaintiff sustained hundreds of thousands of dollars in losses on account of Defendants' fraud *immediately* at that juncture. FAC ¶¶51, 53.[17] The fact and amount of those losses— caused by Defendants— would have remained the exact same regardless of when Plaintiff sold the coins (if ever), and it is bad faith for Defendants to suggest otherwise. *See* Appx. 1. Subsequent movements in gold and silver spot prices do nothing to absolve Defendants of their fraud or the harm caused thereby— and of course speak nothing to the question of arbitrability.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully submits that this Honorable Court should deny Defendants' August 10, 2020 Motion to Compel Arbitration and Dismiss or Stay Proceedings outright, or otherwise via bench trial pursuant to 9 U.S.C. § 4.

Respectfully submitted,

/s/ W. Clifton Holmes
W. Clifton Holmes
The Holmes Law Group, Ltd.
350 N. Orleans St.
Suite 9000N
Chicago, IL 60654
holmes@theholmeslawgroup.com
(312) 721-0779 (t)
Counsel for Plaintiff John Mathys

September 3, 2020

---

[17] As alleged, it was not until March 2020 that Plaintiff received information by which he could adduce the fact of Defendants' fraud, with the assistance of his attorney-in-fact, Dr. Roy. FAC ¶41.

15

# **Appendix 1**



## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd of September, 2020, I caused to be served upon

>James Argionis
>Corey Hickman
>Cozen O'Connor
>123 N. Wacker Dr., Ste. 1800
>Chicago, IL 60606
>jargionis@cozen.com
>chickman@cozen.com
>
>David J. Cohen
>Tovar & Cohen LLP
>5525 Oakdale Ave., Ste. 350
>Woodland Hills, CA 91364
>david@tovarandcohen.com
>
>Counsel for Defendants The Hartford Gold Group, LLC
>and David Wolan

a copy of Plaintiff's Opposition to Defendants' Motion to Dismiss and Compel Arbitration.

_____/s/_____
W. Clifton Holmes