**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| JOHN MATHYS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-cv-03927 |
| | ) | |
| THE HARTFORD GOLD GROUP, LLC | ) | Honorable Charles P. Kocoras |
| d/b/a AMERICAN HARTFORD GOLD | ) | |
| GROUP; and DAVID WOLAN, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OF LAW IN REPLY TO OPPOSITION
TO MOTION TO COMPEL ARBITRATION,
AND TO DISMISS OR STAY PROCEEDINGS**

Defendants The Hartford Gold Group, LLC dba American Hartford Gold Group ("HGG")

and David Wolan ("Wolan") – who are referred to herein collectively as "Defendants" – respectfully

submit their memorandum of law in reply to plaintiff John Mathys' ("Mathys") opposition to their

motion to compel arbitration, and to dismiss or stay proceedings.[1]

---

[1]      At footnote 2 of his opposition, Mathys suggests HGG improperly failed to "record" the name American Hartford Gold Group, which as a fictitious business name, is not required to be registered with California's Secretary of State. However, it is properly registered with the Los Angeles County Registrar-Recorder.

## I.      INTRODUCTION

Mathys' twofold argument contends: (1) HGG's employee, Wolan, lacks standing to enforce the arbitration agreement contained in the two Shipping and Transaction Agreements (the "STAs") into which HGG and Mathys undisputedly entered; and (2) it would be unconscionable for this Court to compel arbitration because: (a) arbitration may be costly; (b) Mathys lacked the capacity to agree to arbitrate; and (c) discovery from non-parties might be limited in arbitration.  Because well-settled law soundly refutes Mathys' arguments, and Mathys failed to meet his burden of providing evidence that the arbitration agreement and its delegation clause are unconscionable, Defendants respectfully submit their motion to compel arbitration and dismiss Mathys' first amended complaint (the "FAC") must be granted.

## II.      ARGUMENT

Mathys' first contention, that Wolan lacks standing to enforce the arbitration agreement in the STAs, wholly disregards his own allegations that Wolan acted as an agent of his employer, HGG. Mathys' second contention, that the arbitration agreement and its delegation clause (collectively the "Arbitration Agreement") are unconscionable, fails not only for lack of legal support, but also because Mathys fails to meet his burden of providing supporting evidence.

### A.      AS HGG'S EMPLOYEE, WOLAN HAS STANDING TO ENFORCE THE ARBITRATION AGREEMENT

The *undisputed evidence* establishes Wolan was at all relevant times HGG's employee, acting on HGG's behalf.  Declaration of David Wolan ("Wolan Decl."), ¶ 2 ("At all times relevant to this action, I was an employee of HGG, with the title Senior Director.")  In fact, Mathys' FAC concedes as much.  *See, e.g.,* FAC, ¶ 6 (Wolan "is a Senior Director of Defendant HGG"); ¶ 17 (Wolan is an

"HGG representative[]"); ¶¶ 18, 21; Exs. C, D (Wolan sent Mathys letters on HGG's letterhead, signing *Senior Director, The Hartford Gold Group,* with an HGG email, Dwolan@hgoldgroup.com); ¶ 23 (Wolan encouraged Mathys to invest assets with HGG); ¶ 24 ("Wolan's knowledge of Plaintiff's advanced age is imputable to Defendant HGG").

Having acted on behalf of his *employer*, HGG, Wolan has standing to enforce the Arbitration Agreement contained in the two identical STAs Mathys entered into with HGG. *Hoffman* v. *Deloitte & Touche*, 143 F.Supp.2d 995, 1005 (N.D. Ill. 2001): non-signatory agents are covered by signatory principals' arbitration agreements where, like here, "only by allowing the non-signatories to invoke arbitration would evisceration of the agreements be avoided"; *Howells* v. *Hoffman*, 209 Ill.App.3d 1004, 1009 (1991): an arbitration provision limited to "controversies which may arise between us" protects the signatory's employee. Because a company like HGG can only act through its employees, allowing a contracting party to avoid arbitration by simply naming an employee of the signatory company as a defendant would effectively render an arbitration agreement meaningless. Indeed, in *Dunmire* v. *Schneider*, 481 F.3d 465, 466-467 (7th Cir. 2007), the Seventh Circuit *rejected* the exact same argument Mathys asserts here, that a non-signatory employee lacked standing to enforce his employer's arbitration agreement stating: "Every dispute between customer and [Morgan Stanley]... shall be settled by arbitration....," because it did not mention employees. (Brackets original.)

Curiously disregarding not only the undisputed evidence – but even his own allegations – that Wolan acted as HGG's employee, Mathys contends Wolan lacks standing to enforce the Arbitration Agreement because he is not an intended third party beneficiary of the STAs. Wolan never claimed to be a third party beneficiary of the STAs – though he likely is (*Dunmire*, 481 F.3d at 467: "To the extent that there is any doubt about this, courts regularly treat employees as third-party beneficiaries

2

of arbitration clauses such as this... No appellate decision goes the other way") – and Mathys wholly ignores his own authority confirming that Illinois law allows a non-signatory employee or agent, like Wolan, to enforce a signatory-principal's arbitration agreement. *Applications Software Tech. LLC* v. *Kapadia*, 2018 WL 3122173, at *9 (N.D. Ill. June 26, 2018): like third party beneficiary, agency is one of six contract-based theories upon which an arbitration agreement may cover a non-signatory.

Because Wolan can enforce the Arbitration Agreement as HGG's employee, none of Mathys' third party beneficiary authorities is relevant, and none even suggests that Wolan, as HGG's agent, lacks standing to enforce the Arbitration Agreement. *See Continental Casualty Co.* v. *American Nat. Ins. Co.,* 417 F.3d 727, 735 (7th Cir. 2005): a non-signatory had standing to enforce the arbitration agreement as a third party beneficiary; *Manor* v. *Copart Inc.*, 2017 WL 4785924, at *7 (N.D. Ill. Oct. 24, 2017): a non-signatory subsidiary had standing to enforce an arbitration agreement as a third party beneficiary; *Safety Solutions, Inc.* v. *City of Chicago*, 2011 WL 3652446, at *10, 12-13 (N.D. Ill. Aug. 18, 2011): an individual plaintiff lacked standing to bring claims arising from her wholly-owned corporation's contract because "the factual allegations do not support any claims or damages that could be plausibly construed as relating to [her]." In contrast here, though Wolan at all times acted solely as HGG's employee, Mathys sued Wolan as an individual, and seeks damages against Wolan personally, so he has standing to enforce the Arbitration Agreement.

## B. THE ARBITRATOR DECIDES THE THRESHOLD ARBITRABILITY ISSUE

As discussed in § 3.C of Defendants' motion, the Arbitration Agreement – stating in relevant part: *"Any dispute, claim, or controversy arising out of this Agreement or otherwise between HGG and the Customer, including but not limited to ... the scope and applicability of the agreement to arbitrate contained in this paragraph, shall be determined by arbitration..."* – clearly and unmistakably

delegates to the arbitrator the threshold arbitrability issue. *Rent-A-Center, West, Inc.* v. *Jackson*, 561 U.S. 63, 69-70, 130 S.Ct. 2772, 177 L.Ed.2d 40 (2010): "We have recognized that parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." Mathys' own authority agrees. *Lee* v. *Uber Technologies, Inc.*, 208 F.Supp.3d 886, 891-892 (N.D. Ill. 2016): clause delegating to arbitrator "disputes arising out of or relating to interpretation or application of this Arbitration Provision, including the enforceability, revocability or validity of the Arbitration Provision" found to be "clear and unmistakable in delegating the question of arbitrability to an arbitrator."

Mathys fares no better with his other authorities. *In re Dealer Management Systems Antitrust Litigation*, 362 F.Supp.3d 510 (N.D. Ill. 2019), involved the motion of one defendant (CDK) seeking to compel arbitration under an agreement another defendant (Reynolds), *CDK's competitor*, entered into with the plaintiffs. Because CDK did not even argue it was entitled to the benefit of Reynolds' agreement to arbitrate arbitrability, the Court did not assess the (conceded) issue, and "proceed[ed] on the assumption that the Court has authority to address the threshold issue of the arbitrability of Plaintiffs' claims against CDK." *Id.,* at 526-527.

In *CCC Info. Serv. Inc.* v. *Tractable Inc.*, 2019 WL 2011092, at *1-2 (N.D. Ill. May 7, 2019), Chen, an employee of the plaintiff's rival, Tractable, secured a license from the plaintiff by falsely representing he worked for "JA Appraisal," which never even existed. Denying Tractable's motion to compel arbitration pursuant to the fraudulently obtained license, the Court explained "a reasonable jury could conclude that plaintiff reasonably believed that it was granting a license to either Chen or JA Appraisal – but not to Tractable...." *Id.,* at *5. Notably, unlike Wolan – HGG's undisputed agent – Chen and "JA Appraisal" expressly represented they were *not* acting as anyone's agent. *Id.*

4

In *Applications Software Tech,* 2018 WL 3122173, at \*9 (granting the defendant's motion to compel arbitration), immediately after the sentence Mathys quotes at p. 4 of his opposition, the Court acknowledged Illinois courts may bind non-signatories to arbitration agreements upon contract-based theories such as agency. And, in *Kramer* v. *Toyota Motor Corp.,* 705 F.3d 1122, 1125 (9th Cir. 2013), after "vigorously litigating" for nearly two years, Toyota unsuccessfully sought to compel arbitration under agreements between plaintiffs and the auto dealerships – who were neither parties to the action nor Toyota's agents – from whom they purchased allegedly defective vehicles. Affirming denial of Toyota's motion, the Ninth Circuit noted: "The United States Supreme Court has held that a litigant who is not a party to an arbitration agreement may invoke arbitration under the FAA if [as here] the relevant state contract law allows the litigant to enforce the agreement." *Id.,* at 1128. Mathys' final authority, *National Oilwell Varco, L.P.* v. *Sadagopan*, 2018 WL 276363 (S.D. Tex. Jan. 3, 2018), involves Texas' one-satisfaction rule, but neither arbitration nor anything else relevant here.

Not only does the STA's Arbitration Agreement "clearly and unmistakably" delegate to the arbitrator the threshold arbitrability issue, but it designates JAMS as the arbitration administrator and JAMS' rules as governing. Declaration of Jennifer Reubel ("Reubel Decl."), ¶ 3; Ex. A, ¶ 12: "The arbitration shall be administered by JAMS pursuant to the rules promulgated by JAMS." JAMS Rule 11(b) – readily available at www.jamsadr.com/rules-comprehensive-arbitration/#Rule-1 – expressly delegates to the arbitrator the arbitrability issue:

> Jurisdictional and arbitrability disputes, including disputes over the
> formation, existence, validity, interpretation or scope of the agreement
> under which Arbitration is sought, and who are proper parties to the
> Arbitration, shall be submitted to and ruled on by the Arbitrator. The
> Arbitrator has the authority to determine jurisdiction and arbitrability
> as a preliminary matter.

5

### C. THE ARBITRATION AGREEMENT IS ENFORCEABLE AND APPLICABLE

Given the "emphatic federal policy in favor of arbitral dispute resolution," *Marmet Health Care Center, Inc.* v. *Brown*, 565 U.S. 530, 533, 132 S.Ct. 1201, 182 L.Ed.2d 42 (2012), Mathys bears the heavy burden of proving his claims "are unsuitable for arbitration." *Green Tree Financial Corp.-Alabama* v. *Randolph*, 531 U.S. 79, 91, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000). Neither the evidence nor the applicable law even marginally supports Mathys' contention that the Arbitration Agreement is unconscionable.

### 1. The Arbitration Agreement is not procedurally unconscionable

Mathys contends the Arbitration Agreement is procedurally unconscionable because: (a) it is printed in a small, single-spaced font; (b) he did not consult with his attorney before signing his two STAs in December 2018 and October 2019; and (c) he "lacked capacity to meaningfully assent to the terms at issue." An arbitration agreement may be procedurally unconscionable "where a term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it." *Davis* v. *Fenton*, 26 F.Supp.3d 727, 737 (N.D. Ill. 2014.)

First, the Arbitration Agreement is printed in the same size and spaced font as the rest of the STA, though its disclosure that "**BY AGREEING TO ARBITRATE ANY CLAIM OR DISPUTE PURSUANT TO THIS PARAGRAPH 12, THE PARTIES WAIVE ANY RIGHTS THEY MAY OTHERWISE HAVE TO A COURT OR JURY TRIAL**" is in bold, upper case type. Reubel Decl.; Ex. A, ¶ 12 (emphasis original.) And, it is appropriately, conspicuously situated within the section of the STA headed "**DISPUTE RESOLUTION.**" *Id.* (emphasis original.) *Davis*, 26 F.Supp.3d at 738: "An arbitration clause does not need to be emphasized with any special font or typeface to prevent it from being procedurally unconscionable; it just needs to be conspicuous."

6

Mathys' purported inability to understand the STA's Arbitration Agreement does not render it unconscionable. *Melena* v. *Anheuser-Busch, Inc.,* 219 Ill.2d 135, 147 (2006): "That the consumer did not read or understand the arbitration clause does not prevent the consumer from consenting to it. Nor does the consumer's ignorance that an arbitration clause is included on the form"; *see also Falkenberg* v. *CB Tax Franchise Systems*, *LP*, 637 F.3d 801, 809 (7th Cir. 2011): "Ignorance of the contract's arbitration provision is no defense if they failed to read the contract before signing." Moreover, Mathys' belated claim that he did not understand the Arbitration Agreement diametrically contradicts his affirmative representation that he "has carefully read, understands and agrees to all the terms and conditions of this agreement [the STA containing the Arbitration Agreement]" – which he signed on two separate occasions. Reubel Decl., ¶ 3; Ex. A, p.5.

Second, if Mathys failed to consult with his attorney before signing either STA, he made that decision unilaterally, and directly contrary to HGG's urging that he obtain legal advice before signing. Reubel Decl., ¶ 3; Ex. A, preamble: "**IT IS IMPORTANT THAT YOU CAREFULLY READ AND FULLY UNDERSTAND THIS AGREEMENT, WHICH GOVERNS THE PARTIES' RIGHTS AND OBLIGATIONS, LIMITS HGG'S LIABILITY, AND THAT YOU CONSULT WITH YOUR ATTORNEY AND/OR FINANCIAL ADVISOR.**" (Emphasis original.)

Third, Mathys' contention that he lacked capacity to meaningfully assent to the Arbitration Agreement is soundly refuted by *undisputed evidence* that he never disclosed any purported cognitive issue to Defendants, and no cognitive issue was apparent to Defendants, who to the contrary found him to be intelligent, with a sharp mind. Wolan Decl., ¶2; Declaration of Paul Stone ("Stone Decl."), ¶ 2. Even if true, Mathys' belated claim he did not understand the Arbitration Agreement would still be irrelevant here. *Melena,* 219 Ill.2d at 147; *Village of South Elgin* v. *Waste Mgmt. of Illinois,* 810

7

N.E.2d 658, 670 (Ill.App. 2004): "'Intent' refers to objective manifestations of intent in the words of the contract and the actions of the parties; it does not encompass one party's secret, undisclosed intentions or purely subjective understandings of which the other party is unaware."

Moreover, Mathys proffers these memory lapse anecdotes to "prove" his alleged cognitive decline precluded him from understanding the Arbitration Agreement, but none of his witnesses is qualified to render an expert opinion as to such causation. *Frisone* v. *U.S.*, 270 F.2d 401, 403 (9th Cir. 1959): the existence of mental illness serious enough to cause permanent memory impairment required expert testimony because "[i]t is well settled that only expert testimony will be allowed on technical questions of causation."

Although Jennifer Wilson-Binotti, Psy.D. might be qualified to render an expert opinion on Mathys' cognitive ability *at the time of her evaluation of him on August 27, 2020* (20 months *after* he signed the first STA and 10 months *after* he signed the second STA), Mathys offers no evidence whatsoever – or even argument, for that matter – establishing her qualifications, as required by Rule 702 of the Federal Rules of Evidence (the "FRE"). *Lewis* v. *CITGO Petroleum Corp.,* 561 F.3d 698, 706 (7th Cir. 2009): the proponent of expert testimony bears the burden of establishing the expert's qualifications; *Advisory Committee Notes* to 2000 amendment to FRE 702: "the proponent has the burden of establishing that the pertinent admissibility requirements are met by a *preponderance of the evidence*." (Italics supplied.) Having offered no evidence of Dr. Wilson-Binotti's qualifications, Mathys undeniably failed to meet his burden, but even if he had, the doctor's report is inadmissible hearsay and not authenticated. (FRE 802, 901.) Moreover, the report is wholly irrelevant (FRE 402) because it does not appear to assess Mathys' ability to understand the Arbitration Agreement, though it does conclude that, as of August 27, 2020, Mathys' complex processing, abstract reasoning, and

nonverbal logical reasoning abilities registered in the high-average to above average range – which seemingly refutes Mathys' cognitive decline argument.

Mathys dubiously contends his purported cognitive decline prevented him from understanding *only the Arbitration Agreement*, but not the rest of the 5-page STA, which he presumably concedes he was competent to enter into because he has sued HGG for breach of the October 2019 STA. FAC, Count IX. Mathys' own authority labels illogical his after-the-fact revelation that purported cognitive decline prevented him from understanding only the Arbitration Agreement, one of 14 sections of the STA. *Spahr* v. *Secco*, 330 F.3d 1266, 1273: "Unlike a claim of fraud in the inducement, which can be directed at individual provisions in a contract, a mental capacity challenge can logically be directed only at the entire contract."

The motive for Mathys' selective purported inability to understand the Arbitration Agreement is no mystery. In *Buckeye Check Cashing, Inc.* v. *Cardegna*, 546 U.S. 440, 445-446, 126 S.Ct. 1204, 163 L.Ed.2d 1038 ("*Buckeye*"), the Supreme Court held "unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." Because Mathys' claim that he lacked the capacity to understand only the Arbitration Agreement but not the rest of the STAs he signed twice is illogical – as his own authority recognizes (*Spahr,* 330 F.3d at 1273) – Mathys' belated capacity contention can only logically be considered a challenge to the entire STAs, a question *Buckeye* says is decided by the arbitrator. *See also Primerica Life Ins. Co.* v. *Brown*, 304 F.3d 469, 472 (5th Cir. 2002): a mental capacity defense challenges the agreement as a whole and is "part of the underlying dispute between the parties which, in light of *Prima Paint* [*Corp.* v. *Flood & Conklin Mfg. Co.,* 388 U.S. 395 (1967)] and its progeny, must be submitted to the arbitrator."

But, in footnote 1 on page 444 of *Buckeye,* acknowledging the distinction between contract validity and contract formation, the Supreme Court indicated that its opinion "does not speak to the issue... whether the signor lacked the mental capacity to assent." Accordingly, whether the arbitrator or the Court considers Mathys' lack of capacity claim remains somewhat unsettled, but 100% certain is that the *undisputed evidence* establishes Mathys never disclosed any purported cognitive issues to Defendants, nor were any purported cognitive issues apparent to Defendants in their dealings with Mathys (Wolan Decl., ¶ 2; Stone Decl., ¶ 2), and Mathys offers no admissible evidence whatsoever that he lacked the mental capacity to assent to the Arbitration Agreement (or the entire STAs for that matter).[2] Thus, regardless who decides the arbitrability issue in light of Mathys' purported capacity allegation, Mathys wholly fails to meet his burden of establishing through admissible evidence that his claims are not arbitrable. *Green Tree Financial Corp.-Alabama,* 531 U.S. at 91.

Mathys' remaining authorities do not support his argument either. In *Frank's Maintenance & Engineering, Inc.* v. *C.A. Roberts Co.,* 408 N.E.2d 403, 410 (Ill.App. 1980) ("*Frank's*"), a damages limitation clause was unenforceable because it was printed on the back of an acknowledgment form, and the clause directing the plaintiff's attention to conditions on the back of the form was "stamped over, indicating that legend was irrelevant." In contrast here, the Arbitration Agreement is quite conspicuously printed beneath the heading "**DISPUTE RESOLUTION**" and prominently notifies Mathys that: "**BY AGREEING TO ARBITRATE ANY CLAIM OR DISPUTE PURSUANT TO THIS PARAGRAPH 12, THE PARTIES WAIVE ANY RIGHTS THEY MAY OTHERWISE HAVE TO A COURT OR JURY TRIAL**." Reubel Decl., ¶ 3; Ex. A, ¶ 12 (emphasis original.) The

---

2      Mathys' testimony at ¶ 3 of his declaration that he has taken medication for memory loss since March 2, 2020 is irrelevant because it postdates his signing of both STAs and has no evidentiary connection to his ability to understand the agreements.

Court in *Frank's* also noted that "prior contracts between the parties" establishing a consistently adhered to policy of excluding consequential damages may have refuted the plaintiff's claim that the provision was unconscionable – noteworthy here because Mathys signed two identical STAs with the Arbitration Agreement ten months apart.[3]

Unlike Mathys here, the plaintiff in *Amirmotazedi* v. *Viacom, Inc.*, 768 F.Supp.2d 256, 263 (D.D.C. 2011), presented *evidence* suggesting she lacked capacity to assent to an agreement because she was inebriated when she signed it. And, in *Gore* v. *Gadd*, 522 P.2d 212, 213-214 (Ore. 1974), a psychiatrist's testimony that the plaintiff's psychosis caused her to act compulsively in selling her home was "insufficient to establish that plaintiff was incompetent" to enter into the contract. Like Mathys here, the plaintiff in *Gore* "outwardly appeared to be fully competent to enter into contractual relations" when she executed the contract. *Id.,* at 213.

### 2.    The Arbitration Agreement is not substantively unconscionable

An agreement may be substantively unconscionable where "the terms are so one-sided as to oppress or unfairly surprise an innocent party." *Davis*, 26 F.Supp.3d at 737-739. Mathys claims the Arbitration Agreement is unconscionable because arbitration may be costly, and he may be precluded from obtaining discovery from out-of-state third parties. Mathys does not come close to meeting his burden on either ground.

To avoid arbitration based upon the purported financial burden, Mathys "must provide some individualized *evidence* that [he] likely will face *prohibitive costs* in the arbitration at issue and that

---

[3]    Mathys' contention that the STA he signed in December 2018 could not compel him to arbitrate claims arising from his October 2019 investments is disingenuous because the identical STAs Mathys signed indicate they "shall govern *all pending and future* precious metals transactions between the parties hereto." Reubel Decl., ¶ 3; Ex. A, p. 1, preamble. (Italics supplied.)

[he] is *financially incapable* of meeting those costs." *Livingston* v. *Associates Finance, Inc.*, 339

F.3d 553, 557 (7th Cir. 2003) (italics supplied). Mathys proffers no actual *evidence* of his likely costs,

but does *argue* he would incur up to $3,000 in filing fees, and half of the arbitrator's fees, which he

claims will total "tens of thousands of dollars" at the rate of between $450 and $600 per hour.[4] Even

assuming Mathys' pure speculation as to the arbitrator's fees were realistic, he offers no evidence

whatsoever even suggesting his share of the fees would be *prohibitive*, as is his burden. Moreover,

as discussed in Defendants' motion, JAMS' rules authorize the arbitrator to reallocate the arbitration

costs – Declaration of David J. Cohen ("Cohen Decl."), ¶ 6; Ex. D, Rule 24(f) – which Defendants

would agree to in the event the arbitrator or this Court found that arbitration would be prohibitively

costly for Mathys.

Equally problematic is Mathys' wholesale failure to demonstrate he is "financially incapable"

of meeting the arbitration costs. At ¶ 7 of his declaration, Mathys testifies he has "no ongoing (bi-

weekly) salary from any source of occupational income," which means he is retired, but does not

exclude other types of income – such as pensions, social security, investments, etc. – and so narrowly

crafted, actually suggests he probably does have other undisclosed sources of income.

Mathys produced no admissible evidence of his assets, offering only the inadmissible hearsay

testimony of his girlfriend, Shirley Roy, that as of two weeks ago, Mathys had savings totaling more

than $300,000, plus about $20,000 in other assets. Declaration of Shirley Roy, ¶ 12: testimony based

upon her review of unauthenticated, hearsay, and (some unspecified) documents and "speaking with

John." In addition to the nonexistent *admissible evidence* regarding Mathys' total income and assets,

---

[4]     Mathys argues he "would have to pay half of the JAMS arbitrator's fees incurred in adjudicating the arbitrability of [his] claims," but of course, those fees would all be avoided if he simply complied with the Arbitration Agreement he agreed to twice.

the requisite meaningful assessment of whether arbitration would be prohibitively costly would, at the very least, require evidence of Mathys' living expenses. *Shipp* v. *XA, Inc.,* No. 06 C 1193, 2006 WL 2583720, at *6-7 (N.D. Ill. Aug. 31, 2006) (granting petition to compel arbitration):

> Shipp's declaration does not disclose whether she has other financial resources, or reveal her financial obligations to permit a useful assessment of her financial position. Although she declares that her husband is unemployed and that she has "significant child care expenses," she fails to present any evidence to corroborate those claims or to quantify her expenses. In short, Shipp fails to demonstrate the kind of financial distress necessary to deny arbitration.

All Mathys' evidence demonstrates is that he is an avid traveler, having traveled (at least) to Montana, Wisconsin, and Chile within the last year alone. Declarations of Shirley Roy, ¶¶ 7, 9; and Diane Snow, ¶ 4. According to www.zillow.com, Mathys lives in a 3,530 square foot, 6 bedroom, 3½ bathroom house with an estimated value exceeding $1,000,000. Supplemental Declaration of David J. Cohen, ¶ 3; Ex. A. Although frequent domestic and international travel and living in a nice house admittedly does not conclusively prove anything, it assuredly suggests that Mathys' financial condition and consequent ability to afford the cost of arbitration is eminently stronger than the parties seeking to avoid arbitration in the opinions upon which Mathys relies. *See, e.g., Arnold* v. *Goldstar Financial Systems, Inc.*, 2002 WL 1941546, at *9-10 (N.D. Ill. Aug. 22, 2002): in a case arising from a credit repair services agreement, "defendants do not take issue with the view that individuals, like plaintiffs, with debt problems are unable to afford such [arbitration] costs"; *Morrison* v. *Circuit City Stores, Inc.*, 317 F.3d 646, 669, 675 (6th Cir. 2003): affirming an order compelling arbitration, but finding a cost-splitting provision – which the STAs do not contain – should have been severed from the arbitration agreement because a recently terminated employee likely could not afford to pay her share of arbitration costs; *Phillips* v. *Associates Home Equity Services, Inc.*, 179 F.Supp.2d 840, 846-

13

847 (N.D. Ill. 2001): plaintiff's evidence that she was in "severe financial straits" was found credible considering her inclusion in the sub-prime loan market targeted by the defendant.[5] Thus, Mathys has wholly failed to meet his burden of producing specific *evidence* that arbitration would likely be prohibitively expensive, and that he cannot afford those costs. *Davis*, 26 F.Supp.3d at 739.

At page 13 of his opposition, Mathys concedes whether he could obtain discovery from out-of-state non-parties in arbitration "is not settled," relying on authorities from other circuits, only one of which actually ruled on the issue, while disregarding authority from *this district supporting* his right to such discovery. *Amgen, Inc.* v. *Kidney Center of Delaware County, Ltd.*, 879 F.Supp. 878, 882 (N.D. Ill. 1995) (granting motion to compel compliance with subpoena for deposition testimony and production of documents, issued to "third persons not parties to the arbitration proceedings"):

> By definition, the FAA applies only to actions involving interstate commerce. ... The arbitration of any action affecting interstate commerce is likely to involve parties and witnesses located in more than one district or state. To find that the wording of the FAA precludes issuance and enforcement of an arbitrator's subpoena of a witness outside the district in which he or she sits, particularly where, as here, such discovery is agreed upon by the parties to the arbitration, would likely lead to rejection of arbitration clauses altogether. That would be contrary to the intent of Congress in enacting a national policy favoring arbitration.

*See also Federal Ins. Co.* v. *Law Offices of Edward T. Joyce*, 2008 WL 4348604 (N.D. Ill. Mar. 13, 2008): district court has authority to enforce discovery subpoena arbitrators issued to a law firm that was not a party to the arbitration. Furthermore, the Supreme Court has held limitations on discovery do not render an arbitration agreement unenforceable. *Gilmer* v. *Interstate/Johnson Lane Corp.*, 500 U.S. 20, 31, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991):

---

[5]     In contrast, HGG's customers like Mathys, who invest in precious metals, are typically financially stable, if not affluent.

> Gilmer also complains that the discovery allowed in arbitration is more limited than in the federal courts, which he contends will make it difficult to prove discrimination. It is unlikely, however, that age discrimination claims require more extensive discovery than other claims we have found to be arbitrable, such as RICO and antitrust claims... Although those [arbitration discovery] procedures might not be as extensive as in the federal courts, by agreeing to arbitrate, a party trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration.

Ultimately, the evidence will prove Defendants fully complied with the STAs, and Mathys simply ignored their recommendation – in a section of the STAs Mathys does *not* claim he failed to understand – that he hold onto his investment for a few years. Mathys cannot avoid the Arbitration Agreement to which he twice agreed by alleging ten mostly repetitive counts arising from the same simple set of purported facts, then complaining the breadth of the case will make arbitration costly. Having offered no admissible evidence supporting his contention that the Arbitration Agreement is unconscionable, Mathys failed to meet his burden, necessitating the granting of Defendants' motion.

## III.   CONCLUSION

Based upon the foregoing, Defendants respectfully request that this Court grant their motion to compel arbitration and dismiss Mathys' first amended complaint, or alternatively, stay this action.

Dated: September 9, 2020

Respectfully submitted,

By:      /s/   James Argionis                    By:        /s/   David J. Cohen

James Argionis (Bar No. 6228773)          David J. Cohen (California Bar No. 136738)
Corey Hickman (Bar No. 6317871)          *Admitted pro hac vice*
COZEN O'CONNOR                                  TOVAR & COHEN LLP
123 North Wacker Drive, Suite 1800        5525 Oakdale Avenue, Suite 350
Chicago, Illinois 60606                            Woodland Hills, California 91364
Telephone:    (312) 474-7900                  Telephone:    (818) 615-0770/(310) 420-4383
Facsimile:    (312) 382-8910                    Facsimile:    (818) 615-0777
jargionis@cozen.com                              david@tovarandcohen.com
chickman@cozen.com

## CERTIFICATE OF SERVICE

I, David J. Cohen, an attorney, hereby certify on September 9, 2020, I caused to be electronically filed a true and correct copy of the foregoing **MEMORANDUM OF LAW IN REPLY TO OPPOSITION TO MOTION TO COMPEL ARBITRATION, AND TO DISMISS OR STAY PROCEEDINGS** with the Clerk of the Court using CM/ECF, which sent electronic notification of such filing to all Counsel of Record.

/s/     David J. Cohen

David J. Cohen
